## TOLEDO NEWSPAPER CO. et al. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. December 15, 1916.)

No. 2786.

1. CONTEMPT &#9758;44—JUDGES &#9758;15(1)—JURISDICTION—CALLING IN JUDGE.

Where a newspaper is charged with contempt in publications concerning a judge sitting in a pending suit, such judge has jurisdiction to dispose of the contempt proceedings, the contempt being of a direct character; but, if there be sufficient time, he should call in another judge.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 128–130; Dec. Dig. &#9758;44; Judges, Cent. Dig. §§ 48–50; Dec. Dig. &#9758;15(1).]

2. CONTEMPT &#9758;66(7)—REVIEW—FINDINGS OF FACT.

A proceeding to punish for criminal contempt being one at law, those matters which are to be naturally inferred, and which the opinion of the lower court assumed, will be considered as found; no specific findings being requested or made.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 232–237; Dec. Dig. &#9758;66(7).]

3. APPEAL AND ERROR &#9758;719(3)—ASSIGNMENTS OF ERROR—JURISDICTION.

Objections that the trial court was without jurisdiction need not be assigned, to be considered, but will be raised by the appellate court on its own motion.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2971, 3490; Dec. Dig. &#9758;719(3).]

4. CONTEMPT &#9758;9—CRIMINAL CONTEMPT—JURISDICTION.

Nonresident judgment creditors of a street railroad company, the terms of whose franchises were about to expire, filed a bill in the District Court against the company, setting forth that compliance with a three-cent fare ordinance of the municipality in which it was located would destroy the equity of redemption from existing mortgages, to, which equity alone they could resort. The city was made a party, but motions for a temporary injunction against enforcement of the ordinance were denied, on the grounds that the ordinance was not self-executing and that the old franchises had not been extended, as claimed. After the first hearing the court subsequently granted a temporary injunction on the ground that the situation had changed; the officers of the city treating the ordinance as self-executing. *Held*, that during the time the court was disposing of the first motion for an injunction, as well as the time when the subsequent motions were pending, the court had jurisdiction, for, despite the denial of the contention that the franchise had been extended, the court had jurisdiction to subsequently grant the injunction, conditions having changed, on the theory that its first order was improvidently made or that the status quo should be preserved pending final determination, and so the publication of articles during those periods interfering with the court's exercise of its jurisdiction, so as to obstruct the administration of justice, would constitute criminal contempt.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 8, 15–18; Dec. Dig. &#9758;9.]

5. APPEAL AND ERROR &#9758;477—RIGHT TO PRESERVE STATUS QUO.

Though an injunction be denied, the court has jurisdiction to preserve the status quo pending appeal or final determination, though dismissing the bill.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2247–2249; Dec. Dig. &#9758;477.]

&#9758;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. CONTEMPT ⬡⇒9—NEWSPAPER PUBLICATION—PENDING CAUSE—OBSTRUC-
TION OF JUSTICE.

Judicial Code (Act March 3, 1911, c. 231) § 268, 36 Stat. 1163 (Comp. St. 1913, § 1245), declares that courts shall have the power to punish contempts of their authority, provided that such power shall not be construed to extend to any cases, except the misbehavior of any person in their presence or so near thereto as to obstruct the administration of justice. A newspaper company, referring to a pending action involving the enforcement of municipal ordinances regulating street car fares to be charged, published articles tending to provoke public resistance to an injunctional order, in case one should be made by the federal judge in a pending suit. Held, that the publication, being calculated to produce resistance to the order of the court, amounted to misconduct, or a misbehavior constituting a contempt.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 8, 15–18; Dec. Dig. ⬡⇒9.

For other definitions, see Words and Phrases, First and Second Series, Contempt.]

7. CONTEMPT ⬡⇒6—NEWSPAPER PUBLICATION—PENDING CASE—OBSTRUCTION
OF JUSTICE.

Such publications being in a newspaper of general circulation in a city and sold under the very courthouse windows, if not brought into and sold within the corridors and offices of the building, and being calculated to obstruct the administration of justice, amount, in view of the history of the enactment of the section, to direct contempt, punishable under Judicial Code, § 268; it appearing that Congress refused to exempt newspapers.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 6, 9, 10, 13; Dec. Dig. ⬡⇒6.]

In Error to the District Court of the United States for the Western Division of the Northern District of Ohio; John M. Killits, Judge.

The Toledo Newspaper Company and another were convicted of criminal contempt (220 Fed. 458), and they bring error. Affirmed.

Lawrence Maxwell, of Cincinnati, Ohio, for plaintiffs in error.

Wm. L. Day and E. S. Wertz, U. S. Atty., both of Cleveland, Ohio, for the United States.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge. The chief franchises of the street railway system in the city of Toledo were by their terms to expire on March 27, 1914, and there had been long and bitter controversy between the street railway company and some elements in the city which opposed franchise renewals, unless on conditions which the railway company would not accept. The council passed an ordinance fixing three cents as the rate of fare after March 27th, and an application was made to the court below for a temporary injunction to forbid any attempt to enforce this ordinance. The Toledo Newspaper Company, a corporation, was the publisher of the Toledo News-Bee, and this paper contained editorial and news articles on the subject. Later, and upon the direction of the judge of the court, an information was filed against the publishing corporation and its managing editor, charg-

ing that certain of the publications constituted a contempt. A demurrer to this information was overruled, an answer was filed, and upon the issue so joined a trial was had. The respondents were found guilty and were condemned to pay fines—a nominal one by the editor, but a very substantial one by the publishing company. 220 Fed. 458. Both respondents join in this writ of error. A more detailed statement of facts will be found in connection with the discussion of the questions involved.

[1] 1. One matter, more or less mentioned on the argument, should receive notice, although it cannot be important to our disposition of the case. At the trial the court was presided over and the findings were made and sentence pronounced by the same judge who was holding the court at the time of the publications complained of. His legal right to conduct the trial is not questioned; indeed, it is obvious that, in the typical case of direct contempt, to require a substitution of judges before the contempt could be punished would be to deprive the proceeding of its summary character and destroy its efficiency as a means of securing the unimpeded administration of the law. However, there are frequent cases where, even though mistakenly, a general belief may easily arise that there is a personal controversy between the contemner and the judge of the court. Even in cases of this class, if the necessity for summary action or if other reasons make impracticable the substitution of another judge to hear the contempt matter, the duty of the regular judge of the court to proceed with it is clear, no matter how embarrassing this duty may be to him; but, in these cases, if there is no immediate urgency, and if no other reason exists making it specially appropriate that the same judge act, we think it by far the better policy to call in another judge; and the federal system provides special facility for so doing. We can well understand the reluctance with which a District Judge would put himself in a position which seemed to be a shifting to another of this sometimes very burdensome and very delicate duty; but it is of the greatest importance that contempt proceedings be put, as far as possible beyond the reach of even unjust adverse criticism, and, in such a situation as has been recited, the judges of this court upon whom the duty may fall will always be ready to assign a judge from another district.

[2] 2. This is an error proceeding, in a case at law. No specific findings of fact were requested or made. General and ultimate findings were embodied in the order. Under these conditions it is not necessary that every fact necessary to support the judgment should be particularly found. Even if we do not here apply the strictness of the rule that every fact necessary to support the judgment will be assumed so far as not contradicted by the record, we may at least assume those things which are naturally to be inferred, and which the opinion and the course of the proceedings below indicate every one took for granted.

[3-5] 3. It is undisputed that the newspaper publications had reference to the general subject-matter, some phases of which were then pending in the District Court, and had reference to the making and the effect of the injunctional order, the application for which was

then pending. It is suggested, if not very directly urged, upon the oral argument, that the court had no jurisdiction whatever in the pending cause to make such an injunctional order as asked, or any order to that effect, and that, therefore, there could be no contempt with regard to such subject-matter. This question is not distinctly covered by any assignment of error nor is it mentioned in the very careful brief prepared by respondents' counsel; but it pertains to the jurisdiction and should be noticed even upon our own motion. It requires further details to be stated.

On January 26, 1914, judgment creditors, citizens of New York, filed in the court below a bill in the nature of a creditors' bill against the railway, citizen of Ohio, setting out, among other things, that the three-cent ordinance was confiscatory, and that compliance therewith would destroy the equity of redemption from existing mortgages, to which equity alone judgment creditors could resort, and that there had been in effect an extension of the franchises until October. It prayed a receivership, and that, if the judgment was not satisfied before the date set for going into effect of the ordinance, the city of Toledo then be made a party defendant, and that it then be enjoined from enforcing the ordinance. A motion for the appointment of a receiver was entered, but not brought on for hearing. March 24th, on petition that day filed, an order was entered permitting plaintiffs to make the city a defendant, and an amended bill was filed accordingly. On the same day the railway company filed its cross-bill against the city, asking the same relief; and motions for preliminary injunction were duly entered. These motions were brought to the attention of the court on March 26th. The court did not that day hear the motions formally, but indicated that, until there was time for decision, matters ought to remain in statu quo. On March 30th, and after formal hearing on the 28th, an opinion was filed holding that the ordinance was not self-executing; that it provided for its execution by the filing of a bill and the obtaining of a court order to put it in force; that all questions involved could be raised in defending such application; that plaintiffs had, in this way, an adequate remedy without themselves moving affirmatively in a court of equity; and, hence, that the court could not grant the injunction asked. No order denying the motions seems to have been entered. Later, the motions were renewed and arguments and hearings before the court were had from time to time in August and September. On September 12th the court filed an opinion holding that the situation had changed in that the city officials were interpreting the ordinance as self-executing and were attempting to enforce it without any court proceeding, and that, since it was practically conceded that the three-cent rate was confiscatory, plaintiffs were entitled to a temporary injunction.

There was ample jurisdiction to justify punishing any contempt committed at this stage of the case. Even if it might be said that the court is not entitled to full protection as a court while it is considering and deciding, either way, the question whether it has power to give the relief sought (U. S. v. Shipp, 203 U. S. 563, 27 Sup. Ct. 165, 51 L. Ed. 319, 8 Ann. Cas. 265; Fair v. Kohler,

228 U. S. 22, 33 Sup. Ct. 410, 57 L. Ed. 716), and even if it might be denied that the real dispute here was whether use of the streets by the company would be an acceptance of the ordinance, notwithstanding the declared purpose not to accept, and might be denied that this dispute presented a justiciable controversy giving power to make an order fixing the terms of use temporarily, yet it cannot be doubted that the bill as filed presented also a claim that the old franchise would not expire until October, and so asserted a good case for the relief asked. The judge on March 30th announced his opinion that this claim was not good in law, and part of the publications complained of were of a later date; but this question abided in the case, in spite of his provisional decision. On the final hearing or on appeal it might turn out that plaintiff was right; and a court may temporarily preserve the status quo, even after deciding to dismiss the cause. Cotting v. Kansas City, 183 U. S. 79, 80, 22 Sup. Ct. 30, 46 L. Ed. 92. The jurisdiction to make a provident order in the subject-matter is clear; and it would not be material to the preliminary jurisdiction if it should be thought that an order actually made was improvident.

The publications complained of were made during the periods from March 24th to March 30th, and from August 14th to September 11th, during the pendency, respectively, of the first and second motions.

[6] 4. The question of jurisdiction past, the next inquiry is whether the publications constituted that "misconduct," to the punishment of which the power of the court is limited by the statute. Judicial Code, § 268. It is clear, from the very words of the statute, that "misconduct" carries a double limitation. Not everything which may rightly be classified under this general name is punishable; to be so, it must have the required character and the required location.

First, as to character: It must "obstruct the administration of justice." Although this limitation is expressed only as to that class of contempts not committed in the physical presence of the court, it must be implied in the other class as well; for the typical case of misconduct in a courtroom inherently "obstructs the administration of justice," and in these five words are epitomized the reasons why power to punish for contempt must exist. If we give our attention alone to this matter of the character of the misconduct, omitting for the present any thought as to its location, we see that we may—so far as the decision of this case is concerned—disregard all cases of mere libel and slander against the judge of the court and all cases of newspaper or other comment directed against past judicial action. In both of these classes, such tendency as there is to obstruct the administration of justice is not of the direct nature which we have here to consider. Whether there may be cases which seem only to refer to the past action of the court, or which seem to be substantially slander or libel, and which, nevertheless, should be treated as an obstruction within the meaning of this statute, is a matter about which we have no occasion to express an opinion. Upon this record, the publications had reference to pending judicial action, and there is a finding of fact ("as alleged in the information") that they tended and were intended to provoke public resistance to an injunctional order, if one should be made, and there is a finding that they constituted an attempt to

intimidate—at least unduly to influence—the District Judge with reference to his decision in the matter pending before him. That each of these findings is supported by competent evidence, and for that reason binding upon this court, is too clear for dispute; but we may rightly go further, and say that it is difficult to see how any other findings could have been made. The publications are set out in some detail in the opinion of the District Judge, 220 Fed. 460–472. They must be considered collectively, not singly; they must be taken, headlines as well as text, as intended to produce the effect which all must know they would be likely to produce upon many of the great audience to which they were addressed. Thatcher v. United States (C. C. A. 6) 212 Fed. 801, 810, —— C. C. A. ——. They were, in form and substance, well adapted to bring about resistance to and utter public disregard of an injunctional order, and to influence a weak judge into denying the order through fear of those weapons of public abuse and ridicule which respondents controlled and showed their willingness to use. Manifestly, it is of no importance that, when the order was finally made, and its operation had been postponed a short time expressly to give opportunity for excitement to die out, no riotous disobedience followed; and it is equally of no importance that in such a case the attempt may produce in the judge's mind irritation, instead of fear.

[7] 5. This leaves for consideration only the second statutory limitation—that pertaining to the place where the misconduct occurs. The elaborate printed brief for plaintiffs in error is devoted wholly to this question, and it is argued, in effect, that a newspaper publication, no matter what its character, and no matter whether with reference to a matter pending, is wholly immune from punishment as for contempt, provided it is not circulated in the courtroom while the court is in session.

It is urged that the record does not show that the publications were currently read by the judge of the court, or that the papers containing them were sold or distributed in the courthouse corridors, on the steps, or in the immediate vicinity of the courthouse. If these facts are essential, they may and should be presumed in support of the judgment. There is no proof to the contrary, and it is highly probable that in a city like Toledo, and with a courthouse situated as it there is, an afternoon paper, with a daily circulation of 50,000, and with five editions each day, not only is read every day by the great part of the reading public, including the judges, but is cried and sold by the hundreds and thousands under the courthouse windows, and is brought into, if not sold in, the corridors and offices of the building. We refer to these presumptions and probabilities only to indicate that the lack of precise allegation or proof as to these facts cannot, in any event, be fatal, but without intending to decide whether these facts may be necessary.

Considering only the face of the statute, we see no reason to think that a newspaper publication, circulating in enormous numbers in the very community where the court is sitting, and where its order, if made, is to be executed, and reaching and appealing to the very per-

sons who are to be affected by the order, and surely tending to prevent an impartial and free decision by judge or jury, may not rightly be deemed "so near thereto". as to constitute an obstruction to the due administration of justice. The very statement of the situation seems to show that such a publication, if it is of the character to be called "misconduct," is within the class which may be punished. Indeed, the only substantial argument to the contrary is that the history of the statute shows an intent by Congress to make all newspaper publications immune, and, hence, that the language of. the statute should be construed, even at the cost of some violence to its letter, so as to carry out this congressional intent. The history of the statute and the various decisions, state or federal, which have considered and construed this or similar laws, are most thoroughly considered by the District Judge in his opinion. See 220 Fed. 474–491. . We are not called upon to sanction every characterization or every subordinate conclusion found in this discussion; we may or may not do so; but we approve its general course and its result and its analysis of the opinions cited. We can add only one thing. The Pennsylvania statute (Laws 1808–1812, p. 55), which is said to have been so far the basis and model of the federal statute that the latter should be treated as for the same purpose and having the same effect as the former, not only gave immunity to all misconduct not in the presence of the court, and omitted the modifying "or so near thereto," but also contained a section expressly prohibiting any contempt proceedings based on any newspaper publication.[1] The Pennsylvania Legislature, apparently realizing that a newspaper publication, on account of its very broad operation, might perhaps be considered as being "in the presence of the court," thereupon added an express provision on the specific subject, and by that express provision (section 2) granted that further immunity which the Legislature thought the public policy of the state required. If it be true, as claimed, that the Pennsylvania statute was the model which Congress had before it, and if it be true that the federal statute should be construed on the theory that the protection of a newspaper from oppressive contempt proceedings, as exemplified in the matter of Judge Peck, was the real subject-matter present in the congressional mind, we find, first, that the evil under consideration, and the exemption which the Peck proceedings suggested, pertained, not to interference in pending cases, but to comments on past decisions; we find, second, that in the language intended to exclude from immunity Congress inserted a limitation—"or so near thereto, etc."—well adapted to reach, and so exclude from immunity, many cases of newspaper publication; we find, third, that Congress refused to adopt, from the model before it, that provision which sought expressly to reach and protect a newspaper. From this history of the statute, we cannot understand how a general intent to

---

[1] Section 2, Act of April 3, 1809: "All publications out of court respecting the conduct of the judges, officers of the court, jurors, witnesses, parties, or any of them, of, in and concerning any cause pending before any court of this commonwealth, shall not be construed into a contempt of the said court, so as to render the author, printer, publisher, or either of them, liable to attachment and summary punishment for the same."

make all newspaper publications immune can be inferred; the ordinary canons of construction lead to the contrary inference.[2]

What has been so far said pertains to the first count of the information. The sentences imposed are amply supported by conviction under the first count, and whether the record shows any error, as to the second and third counts becomes immaterial. Claassen v. United States, 142 U. S. 140, 146, 12 Sup. Ct. 169, 35 L. Ed. 966; Hardesty v. United States (C. C. A. 6) 168 Fed. 25, 26, 93 C. C. A. 417. We the more readily apply this rule, and refrain from detailed consideration of these counts, because it is clear enough that they pertain merely to matters in aggravation of the unitary course of conduct covered by the first count.

The judgment and the sentences imposed are affirmed; but, since costs are not awarded either for or against the United States, the affirmance will be without costs.

2 Decisions, since the opinion below, and tending to support the same conclusion are: In re Independent Pub. Co. (Bourquin, D. J.) 228 Fed. 787; State v. Nelson, 29 N. D. 155, 150 N. W. 267; Tate v. State, 132 Tenn. 131, 177 S. W. 69.