### Ex parte CRAIG.

(Circuit Judge, Second Circuit. April 29, 1921.)

1. **Habeas corpus ⊜47(1)—Circuit judge has authority to grant writ.**
    A United States circuit judge *held* to have authority to grant a writ of habeas corpus.

2. **Habeas corpus ⊜4—Writ cannot be used as writ of error.**
    A writ of habeas corpus cannot be invoked to review an erroneous judgment of a court of competent jurisdiction, but challenges the jurisdiction of the court.

3. **Habeas corpus ⊜25(1)—Writ may discharge from imprisonment in violation of constitutional right.**
    Where by a sentence to imprisonment there is a denial or invasion of a constitutional right, the prisoner may be discharged on habeas corpus.

4. **Habeas corpus ⊜28—Lies where court transcended its powers.**
    A prisoner may be discharged on habeas corpus, if on inquiry raised by the writ it is found that the court in imposing the sentence transcended its powers.

5. **Contempt ⊜9—Letter held not to constitute criminal contempt.**
    A letter written by petitioner, as an officer of New York City, criticizing the action of a federal judge in denying an application by the city for the appointment of petitioner as coreceiver of a street railway company, on the ground that it prevented petitioner from access, as matter of right, to the books and records of the company in the interests of the city, where the application had been finally disposed of before the letter was written, *held* not misbehavior in or so near the presence of the court as to obstruct the administration of justice, and a judgment imposing a sentence of imprisonment on petitioner for criminal contempt under Judicial Code, § 268 (Comp. St. § 1245), *held* in excess of the powers of the court, and void.

6. **Action ⊜66—"Pending cause" defined.**
    A cause is "pending," when it is still open to modification, appeal, or rehearing, and until the final judgment is rendered.

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Pending.]

Petition of Charles L. Craig for writ of habeas corpus. Writ granted.

See, also, 266 Fed. 230.

At the time referred to herein the petitioner was the comptroller of the city of New York, duly qualified and serving as such. He was also a member

of its board of estimate. Heretofore the Brooklyn Rapid Transit Company, the New York Municipal Railway Corporation, the New York Consolidated Railway Company and the New York City Railway Company, all operating street railways in the city of New York, found themselves in financial difficulties, and receivers in equity were appointed by District Judge Mayer. The Interborough Consolidated Corporation, also a railway corporation, was declared a bankrupt. and a receiver of its assets was appointed. On January 15, 1919, the city of New York, pursuant to a resolution of the board of estimate and apportionment, through its corporation counsel, applied to the District Court for the appointment of a coreceiver in the Brooklyn Rapid Transit Company suit. It was sought to have the comptroller appointed receiver. The intention was that he would serve without compensation, and thus look after the interests of the city of New York. The claim was that the city was interested in representing its citizens as well as protecting its rights under the various franchises granted to the railway corporations. The court denied the application for the appointment of a coreceiver. This denial was upon the merits, but the opinion stated that it was "without prejudice to its renewal at such time as counsel may be advised." No further application for the appointment of a cereceiver was made before the petitioner wrote and sent the letter which is the subject of the charge for contempt herein. The controversy between the officials of the city and those who had charge of the affairs of the railway companies was very spirited. An application was made before the board of estimate and apportionment for an increase in fare, and this gave rise to hostility in the controversy.

Between the time of the appointment of receivers and the 1st of October, 1919, expert accountants appointed by the court, made an examination of the books, and made a report as to the financial condition of the company and suggestions were made as to the requirements of the company. Undoubtedly this resulted in the application for an increase in fare. Mr. Lewis Nixon was the public service commissioner for the First district of the state of New York. As representative of this commission, and under the terms of the New York statute, he was an interested party in the litigation. On October 1, 1919, Mr. Nixon called for a conference to be held in the city of New York on October 6 following, for the purpose of discussing the financial and physical condition of the traction lines of the city of New York, including the Brooklyn Rapid Transit Company. He invited the officials of the city of New York, including the petitioner, to this conference. On October 6, 1919, the petitioner wrote and caused to be sent, the following letter:

"October 6, 1919.

"Hon. Lewis Nixon, Public Service Commissioner—Dear Sir: Replying to your letter of October 1: Apparently without inquiry and without information, you have fixed the time for the proposed conference upon a date, which, if observed, would require the members of the finance and budget committee of the board of estimate and apportionment (comprising the entire board) to drop the preparation of the largest budget in the history of New York City, in which work, as you could easily have ascertained, they have been for some time and must continue to be engaged in daily sessions from early to late. In your letter you say: 'It may be necessary to review figures and examine leases and agreements that will consume time.' Before any such conference can be seriously considered, and as an evidence of good faith on the part of those acting by and under the authority of United States District Judge Mayer, there must be a reversal of the policy, for which Judge Mayer is responsible, of denying to myself and other members of the board of estimate and apportionment any access to original sources of information concerning the property and affairs of these various public utility corporations holding franchises to operate in the streets of New York. When the applications were made to Judge Mayer in the 'friendly' proceedings instituted by those interested in these corporations for the appointment of a receiver of their own liking, if not of their own selection, the corporation counsel of the city of New York, acting under instructions from the board of estimate and apportionment given at my instance, urged upon Judge Mayer that he appoint an additional or coreceiver acceptable to the board of estimate and

apportionment, to see that the facts and conditions of the corporations involved were fairly and fully presented to the United States District Court in the course of the receivership, so that any orders or decrees that might be made by the court would be fair and just to the city of New York, and the members of the board of estimate and apportionment might be accurately informed with respect thereto, in order that any action deemed necessary by the city might be taken.

"As you must be aware, it is a very common thing in large receiverships to appoint additional receivers, particularly where there are varied and conflicting interests, and I have never been able t understand why, in a matter of great public concern such as this, Judge Moyer set himself against it. It was clearly understood that conditions were certain to develop in these receiverships where the responsible authorities would be urged to take action which no honest or intelligent man could be expected to consider without the most exact and complete information upon the entire subject. Judge Mayer refused to grant any of the relief sought by the city. He not only denied the relief, but he made orders which preclude any application being made by the municipal authorities to any other court or judge for any right of examination into the affairs or conditions of these corporations seeking municipal aid and favor. Truth is the mightiest weapon in every controversy. The orders of Judge Mayer deny to the municipal authorities the opportunity to ascertain the truth. The franchises and rights enjoyed by these corporations were mostly all procured many years ago, when corrupt political rings were in control of public affairs in the darkest scandals of municipal history, both in the old city of New York and in the city of Brooklyn prior to consolidation, are those in relation to such grants. The affairs of the franchise-holding corporations have been in the hands of the boldest and most unscrupulous manipulators engaged in the exploitation of the rights obtained from corrupt political rings. Up to the present moment they have defied every power that has sought to open up the books and original records for search and examination in the public interest. They will open and open wide, without any reservations or restrictions, before there will be any conference so far as I am concerned.

"It seems to me a monstrous thing that an order of a federal judge in a court of equity should stand between the public and the truth under such circumstances. Such an order is hostile to every interest of the city of New York in these controversies. Its operation and effect is to disarm the municipal authorities, to deny them the most effective instrument of redress, and to force them into a contest with corporate powers entrenched in darkness and concealment. The responsibility for the turmoil, delay, and dissatisfaction that has followed upon the orders of Judge Mayer, denying to the city of New York any representation in these receiverships, rests upon those who procure and are protected by such orders. As a first and preliminary evidence of good faith, those who desire such a conference and a reasonable solution of existing complications should procure the entry of orders by Judge Mayer putting the city of New York on an equal footing with the private interests active in the receiverships. A refusal to do this can but prolong and embitter the controversy; and it will not in the end procure any advantage whatever to the traction interests.

"Yours very truly,  Charles L. Craig, Comptroller."

The sending of this letter resulted in an information being filed, charging the petitioner, as a defendant, with criminal contempt under section 268 of the Judicial Code (Comp. St. § 1245). In the information it was charged that he caused the publication of the letter, not only by sending it to the Public Service Commission, but also by sending it to various newspapers published within the district. The information charges that the following statements in the letter are false:

First. The statement that the court was responsible for a policy of denying to the defendant and other members of the board of estimate and apportionment of the city of New York any access to original sources of information concerning the property and affairs of the various public utility corporations in the hands of the receivers appointed by the court.

Second. That it is stated in the letter that the court made orders which

precluded any application being made by the authorities of the city of New York to any other court or judge for any right of examination into the affairs or conditions of the said public utilities corporation, whereas in truth and in fact the court never made any such order, and, on the contrary, expressly ordered and directed that there should be given to the authorities of the city of New York every opportunity and facility for making such examination.

Third. That it is stated in the letter that orders of the court denied to the authorities of the city of New York the opportunity to ascertain the truth, whereas in truth and in fact the court never made any such orders, and has never made any orders that had such an effect.

Fourth. That the letter stated that an order of the court stands between the public and the truth, whereas in truth and in fact no such order was made. That in point of fact the court directed every facility be afforded to the public officials and citizens' associations to satisfy themselves in respect to the financial and other conditions relative to the corporations in charge of the receivers.

The charge is that the petitioner willfully, knowingly, unlawfully, and contemptuously made these statements. It is alleged that the publication was calculated and intended by the petitioner to influence the court in the exercise of its lawful functions, and to force and compel it to decide applications and questions in issue in accordance with the views and wishes of the petitioner; that it was written for the purpose of inciting public ridicule, scorn and condemnation, if its decisions were contrary to or at variance with the views and wishes of the defendant; that it tended to obstruct and impede the administration of justice in said suits and proceedings.

A demurrer was interposed to this information, alleging various grounds why it was insufficient. This was overruled. The petitioner was then held to answer in contempt before Judge Mayer. A trial was commenced May. 10, 1920, and concluded on June 10, 1920, with decision reserved.

The petitioner was a witness in his own behalf. He gave testimony as to his intention and purposes in writing the letter referred to. He said the letter from Commissioner Nixon came to him on the morning of October 6. The letter was one of the many things he had to attend to on that morning. It was written in considerable haste, and the writer's purpose was to "get into the mind of Nixon the necessity for that kind of co-operation resulting in the public authorities being on an equal footing with those representing the traction interests." He said it was physically impossible for him to have attended the conference on October 6. He did not expect the commissioner to read the letter at the conference, and the letter was not intended for any one else but the public service commissioner. It was explained by him that the letter reached the public press through a usual routine of giving out letters for publication which prevailed in the comptroller's office. This was done through his secretary, who is an appointee of and paid by the city. He further testified as to what he intended by the language employed in his letter. He said that what he meant by "original sources" was that letters and documents of the railway companies were kept in their archives, and he meant, by "denying" original sources, inability to have "full and unrestricted access, with power to compel any subordinate to produce or dig up whatever it might be, or be suspected of being, all of the facts that relate to these companies," that anything that "cut us short of that was a denial of access to the original sources, and that the very purpose of the application that had been made to the United States District Court for the appointment of a coreceiver was to have some one who was in a position to bring about these disclosures, and the necessary effect of the order denying that application was to deny to the municipal authorities in question that kind of access to the original sources." He stated how it was important to the financial interest of the city of New York and to its citizens to have its officials well informed of the matters pertaining to the railroad company's affairs; that the most feasible and practicable way to this end was that a coreceiver be appointed who in some way would be representative of the city.

The petitioner is a lawyer, and his testimony indicates that he had at the time considerable information concerning the railroad company's affairs and its relations to the city in connection with the franchise obligations. He

denied that he gave publicity to the letter, other than sending it to the commissioner. He also denied that at any time he intended to convey the meaning that the District Judge had in point of fact denied access to original papers, except in so far as such denial might flow from his refusal to appoint him coreceiver.

On February 24, 1921, the court adjudged the petitioner guilty and sentenced him to serve a term of 60 days in the Essex County Prison in the state of New Jersey. The petitioner in the meantime continued to perform his official duties as comptroller. His term will not expire until December 31, 1921.

John P. O'Brien, Corp. Counsel, of New York City (Edmund L. Mooney, Charles T. B. Rowe, Alfred B. Cruikshank, Russell Lord Tarbox, and Frank I. Tierney, all of New York City, of counsel), for petitioner.

Francis G. Caffey, U. S. Atty., of New York City (Ben A. Matthews and David V. Cahill, both of New York City, of counsel), for respondent.

Before MANTON, Circuit Judge.

MANTON, Circuit Judge (after stating the facts as above). [1] The power of a circuit judge to issue a writ of habeas corpus is questioned by a motion to dismiss. I have held heretofore that a circuit judge has such power. In re David Lamar (C. C. A.) 274 Fed. 160. Nothing has been submitted in this proceeding which causes me to change the views there expressed. Further, at the time of the issuance of this writ, the circuit judge writing was by assignment empowered to consider matters of original jurisdiction. The application to dismiss the writ for want of authority to issue the same is denied.

[2] A writ of habeas corpus cannot be made to perform the office of a writ of error. Nor can it be invoked to review an erroneous judgment of a court of competent jurisdiction. It challenges the jurisdiction of the court. In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092; Ex parte Yarbrough, 110 U. S. 651, 4 Sup. Ct. 152, 28 L. Ed. 274; Ex parte Watkins, 28 U. S. (3 Pet.) 193, 7 L. Ed. 650.

In a contempt proceeding it may be available to relieve a prisoner from the restraint imposed if the judgment is void on the ground that the court was without the power to make it. But the usual objection to the remedy sought by the medium of habeas corpus is that there is a regular judgment of conviction which cannot be questioned collaterally. There are exceptions to this rule which have been recognized. Ex parte Lange, 18 Wall. 163, 21 L. Ed. 872; Ex parte Siebold, 100 U. S. 371, 25 L. Ed. 717.

If the court which renders a judgment has not jurisdiction to render it, either because the proceedings or the law under which they are taken are unconstitutional, or for any other reason, the judgment is void and may be questioned collaterally. The defendant, who is imprisoned under and by virtue of such a judgment, may be discharged from custody on habeas corpus. In re Hans Nielsen, 131 U. S. 176, 183, 9 Sup. Ct. 672, 674 (33 L. Ed. 118). There the court said:

"In the present case, it is true, the ground for the habeas corpus was, not the invalidity of an act of Congress under which the defendant was indicted, but a second prosecution and trial for the same offense, contrary to an express provision of the Constitution. In other words, a constitutional immunity of the defendant was violated by the second trial and judgment. It is difficult to

see why a conviction and punishment under an unconstitutional law is more violative of a person's constitutional rights than an unconstitutional conviction and punishment under a valid law. In the first case, it is true, the court has no authority to take cognizance of the case; but, in the other, it has no authority to render judgment against the defendant."

In Ex parte Lange, supra, the court had authority to hear and determine the case. But the Supreme Court held it had no authority to give the judgment it did. As was said in the Nielsen Case, supra:

"He was protected by a constitutional provision, securing to him a fundamental right. It was not a case of mere error in law, but a case of denying to a person a constitutional right."

[3] So where there is a denial or invasion of a constitutional right, the prisoner may be discharged on a habeas corpus. Therefore the determining inquiries are: (a) Had the district judge jurisdiction of the person and subject-matter? (b) Was the sentence imposed within its power?

Judicial Code, § 268, 36 Stat. 1163 (Comp. St. § 1245), provides:

"The said courts [United States courts] shall have power * * * to punish, by fine or imprisonment, at the discretion of the court, contempts of their authority: Provided, that such power to punish for contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice. *. * * "

In Henry v. Henkel, 235 U. S. 219, 35 Sup. Ct. 54, 59 L. Ed. 203, it is pointed out that there were five exceptions to the rule that there can be no review on a habeas corpus of a sentence which can be reviewed on appeal or by a writ of error. One of the five exceptions is where the judgment or order entered under which he is held is a nullity because in excess of the power of the court.

An example of this exception was recently before the Supreme Court in Ex parte Hudgings, 249 U. S. 378, 39 Sup. Ct. 337, 63 L. Ed. 656, 11 A. L. R. 333. There, on a rule to show cause, a petition of habeas corpus seeking the discharge of the petitioner from custody under a commitment for contempt was filed. The grounds for discharge were that the court had exceeded its jurisdiction by punishing as a contempt an act which it had no power to so punish, and that even if the act punished was susceptible of being treated as a contempt, the action of the court was arbitrary, beyond the limits of any discretion possessed, and violative of due process of law under the Fifth Amendment. The court said:

"The duty to consider the case arises from the permission to file, and therefore prima facie implies that it is of such a character as to be an exception to the rule of procedure, that other available sources of judicial power may not be passed by for the purpose of obtaining relief by resort to the original jurisdiction of this court. Ex parte Royal, 117 U. S. 254; Riggins v. United States, 199 U. S. 547; Glasgow v. Moyer, 225 U. S. 420, 428; Johnson v. Hoy, 227 U. S. 245; Jones v. Perkins, 245 U. S. 390; In re Mirzen, 119 U. S. 584; In re Huntington, 137 U. S. 63. Whether, however, definitely the case is of such exceptional character, must depend upon an analysis of the merits, which we now proceed to make upon the petition, the return, argument for the petitioner, suggestions by the United States, a statement by the judge, and

a transcript of the stenographer's notes showing what transpired in the court below, made a part of the argument of the petitioner, and in substance conceded by all parties to be the record."

In the case at bar there is submitted the petition, alleging, among other things, that the judgment under which the petitioner is held is a nullity, because in excess of the power of the court, and because of the arbitrary action of the court beyond the limits of any discretion possessed. The proceedings are sought to be justified by the return which is filed and the testimony taken on the hearing before Judge Mayer is made a part thereof. It is argued on behalf of the petitioner (a) that there is no contempt either in substance or in the language of the letter of October 6; and (b) that at the time the letter was written the subject-matter of the criticism was not pending sub judice.

In the Hudgings Case, supra, a witness testified who was declared by the district judge to be committing perjury. The judge considered him in contempt of court because of his continuous refusal to recognize writings shown to him, the signature of which he said he could not identify because he had no recollection of having seen the signatory sign. The district judge, because of the peculiar circumstances of the case, thought the contrary, and held that the witness was testifying falsely, and that his refusal was obstructing the course of justice in the presence of the court. The Supreme Court discharged the prisoner and said:

"Existing within the limits of and sanctioned by the Constitution, the power to punish for contempt committed in the presence of the court is not controlled by the limitations of the Constitution as to modes of accusation and methods of trial generally safeguarding the rights of the citizen. This, however, expresses no purpose to exempt judicial authority from constitutional limitations, since its great and only purpose is to secure judicial authority from obstruction in the performance of its duties to the end that means appropriate for the preservation and enforcement of the Constitution may be secured. Toledo Newspaper Co. v. United States, 247 U. S. 402; Marshall v. Gordon, 243 U. S. 521. An obstruction to the performance of judicial duty resulting from an act done in the presence of the court is, then, the characteristic upon which the power to punish for contempt must rest. This being true, it follows that the presence of that element must clearly be shown in every case where the power to punish for contempt is exerted—a principle which, applied to the subject in hand, exacts that in order to punish perjury in the presence of the court there must be added to the essential elements of perjury under the general law the further element of obstruction to the court in the performance of its duty. * * * But the mistake is, we think, evident, since it either overlooks or misconceives the essential characteristic of the obstructive tendency underlying the contempt power, or mistakenly attributes a necessarily inherent obstructive effect to false swearing. * * * Testing the power to make the commitment which is under consideration in this case by the principles thus stated, we are of opinion that the commitment was void for excess of power—a conclusion irresistibly following from the fact that the punishment was imposed for the supposed perjury alone, without reference to any circumstance or condition giving to it an obstructive effect."

The argument of the petitioner is that there was an excess of power exercised by the district judge; that the conviction for contempt is therefore a nullity. He contends among other things (1) that the writing and sending of the letter does not tend to obstruct the admin-

istration of justice; (2) that at the time the letter was sent the application for the appointment of a coreceiver had been disposed of, and therefore there was not pending before the court a proceeding which the letter could affect by obstructing the administration of justice.

[4] If either of these contentions be sound, there was an excess of power exercised in the action of the district judge and the petitioner is entitled to his discharge on this writ. Ex parte Royall, 117 U. S. 241, 6 Sup. Ct. 734, 29 L. Ed. 868; Ex parte Lange, 85 U. S. (18 Wall.) 163, 21 L. Ed. 872; New York v. Eno, 155 U. S. 89, 15 Sup. Ct. 30, 39 L. Ed. 80; In re Loney, 134 U. S. 372, 10 Sup. Ct. 384, 33 L. Ed. 949; Ex parte Siebold, 100 U. S. 371, 25 L. Ed. 717. He may be discharged, if on inquiry raised by the writ it is found that the court "has transcended its powers." Ex parte Parks, 93 U. S. 18, 23 L. Ed. 787. In Ex parte Lange, 85 U. S. (18 Wall.) 163, 166, 178 (21 L. Ed. 872), Justice Miller said:

"Disclaiming any assertion of a general power of review over the judgments of the inferior courts in criminal cases, by the use of the writ of habeas corpus or otherwise, we proceed to examine the case as disclosed by the record of the Circuit Court and the return of the marshal, in whose custody the prisoner is found, to ascertain whether it shows that the court below had any power to render the judgment by which the prisoner is held. * * * There is no more sacred duty of a court than, in a case properly before it, to maintain unimpaired those securities for the personal rights of the individual which have received for ages the sanction of the jurist and the statesman; and in such cases no narrow or illiberal construction should be given to the words of the fundamental law in which they are embodied. Without straining either the Constitution of the United States, or the well-settled principles of the common law, we have come to the conclusion that the sentence of the Circuit Court under which the petitioner is held a prisoner was pronounced without authority, and he should therefore be discharged."

In Bacon's Abridgement, Habeas Corpus, B 10, the rule states:

"If the commitment be against law, as being made by one who had no jurisdiction of the cause or for a matter for which by law no man ought to be punished, the courts are to discharge."

In Ex parte Siebold, 100 U. S. 371, 25 L. Ed. 717, the Supreme Court approved the foregoing quotation and said:

"The latter part of this rule, when applied to imprisonment under conviction and sentence, is confined to cases of clear and manifest want of criminality in the matter charged, such as in effect to render the proceedings void."

The court must act judicially in all things and cannot transcend the power conferred by the law, and when the court does so in imposing the sentence not merely is an error committed, but the judgment is absolutely void. Bailey on Habeas Corpus, § 50. In Ex parte Parks, 93 U. S. at page 22, 23 L. Ed. 787, Justice Bradley said:

"From this review of the law it is apparent, therefore, as before suggested, that in a case like the present, where the prisoner is in execution upon a conviction, the writ ought not to be issued or, if issued, the prisoner should at once be remanded, if the court below had jurisdiction of the offense, and did no act beyond the powers conferred upon it. The court will look into the proceedings so far as to determine this question. If it finds that the court below has transcended its powers it will grant the writ and discharge the prisoner, even after judgment."

[5] From this record it is evident that if any contempt was committed it was a constructive contempt as distinguished from direct contempt. The district judge in his opinion fixes responsibility of guilt upon that portion of the letter written which contains a false charge that the "judge was responsible for a policy of denying to the writer and other members of the board of estimate and apportionment any access to original sources of information concerning the property and affairs of the company." He held this to be a contempt of court, within section 268 of the Judicial Code, as misbehavior so near the court as to obstruct the administration of justice.

The findings of fact having any evidence to support them are binding upon an application such as this. The objectionable language of the letter is referred to in the court's opinion (United States v. Craig [D. C.] 266 Fed. 230):

"Before any such conference can be seriously considered, and as an evidence of good faith on the part of those acting by and under the authority of United States District Judge Mayer, there must be a reversal of the policy for which Judge Mayer is responsible of denying to myself and other members of the board of estimate and apportionment any access to original sources of information concerning the property and affairs of these various public utility corporations holding franchises to operate in the streets of New York."

It will be observed that the entire letter refers to the denial of the application to appoint a coreceiver. The purport of the letter, taken as a whole, is a criticism of the district judge who denied the application. If the comptroller were appointed coreceiver, he would have the access he sought as a matter of right. The finding of the district judge is that he had it as a matter of favor. Therefore it is concluded that the statement of the denial of access is false. The district judge says in his opinion (266 Fed. 231):

"The right to criticise the correctness of the decisions of courts and judges has always existed under our form of government, and must continue to exist, not merely as a right possessed by the individual, but as a safeguard to our institutions. Such criticism often invites valuable discussion and deliberation, and not infrequently results in correcting error. But such right must not be confused with 'the misbehavior * * * so near' the presence of the court 'as to obstruct the administration of justice.'"

This quotation well expresses the rule for guidance in the determination of a charge of contempt under the statute. A criminal contempt is conduct that is directed against the dignity and authority of the court. It is an offense against organized society. Although it may arise in the course of private litigation, it is not a part of the litigation but creates an issue between the public and accused. In determining whether the language used was or was not a contempt, regard must be had not merely to the very words used, but to the surrounding circumstances in connection with which they were used. The tone and the emphasis must be considered. The determination as to whether a contempt has been committed does not depend upon the intention of the offending party, but on the act done. Such is the rule in cases of direct contempt. But in constructive contempt, such as is charged here, where the language used is not per se libelous, but is fully capable of innocent meaning, the intention of the offending party is a factor and

may control. The rule is now well settled that it is a contempt to issue a publication which is calculated to prejudice or prevent fair and impartial action in a cause of judicial investigation then pending. It is as much a contempt as if one sought to influence judicial action by threats or other form of intimidation which reflect on the court or which stands to corrupt or embarrass the due administration of justice. Toledo Newspaper Case, 247 U. S. 402, 38 Sup. Ct. 560, 62 L. Ed. 1186.

But publications made in good faith and couched in respectful language are not contemptuous. So, where the publication complained of can have no tendency to prejudice the cause, the publisher may not be found guilty of contempt. To vindicate the dignity of the court in compelling respect and obedience, a judge may best demonstrate his title to respect by keeping within the confines of judicial obligation and not reaching out beyond his powers. To visit punishment unjustly upon another official, who acts within the limits of what he conceives to be his duty, and who attempts, whether inadvisedly or otherwise, to secure some means of keeping his employer (a municipality) advised by right of access, rather than the favor of access, to papers and information concerning the railroad properties, is clearly an excess of the power possessed.

There is no divinity about the office or duties of a judge which makes. him free from criticism. The statute requires a misbehavior which causes an obstruction of the administration of justice. The federal Constitution (Amendment 1) guarantees the right to every person to freely speak, write, and publish on all subjects. The writer is responsible for the abuse of that right. Therefore the liberty thus accorded the writer must not be confounded with mere license. The liberty of the writer stops where a further exercise would invade the rights of others. The guarantee of the Constitution does not authorize usurpation of the functions of the courts. A writer with his liberty has no right to assault a judge during the progress of a trial. When his thought and pen are used so as to constitute misbehavior in the presence of the court, or so near thereto as to obstruct the administration of justice, he invades the rights of others. There is little doubt that a sentiment expressed in writing favorable or unfavorable to one of the parties in a case may be made to so pervade the community as to reach the courtroom and interfere with the fair and impartial consideration of a judge in the performance of his duty. But the essence of the offense is conduct reasonably calculated to produce such an atmosphere and such a result. It is well settled that where his contempt is committed without the presence of the court every reasonable doubt will be resolved in favor of the accused. The charge is quasi criminal.

The language of the letter, particularly the portion which has been deemed offensive, could not in any degree be considered misbehavior of a person "so near the presence of the court as to obstruct the administration of justice." There was but one letter. There seems to be but one paragraph which constitutes the charged misbehavior. By no interpretation can the letter be said to have any tendency to embarrass or influence the court so as to prevent a fair trial or a just conclusion in regard to any matter which was then pending before the court.

Every case must be measured by its own facts. To have adjudged this misbehavior "so near the presence of the court as to obstruct the administration of justice" was to exercise a power beyond the jurisdiction of the district judge.

The rule throughout, relied upon by the accuser, is the Toledo Newspaper Case, supra. There the court imposed punishment for newspaper publications, but this was done on the ground that the publications obstructed justice. It was a very extreme case. It consisted of continuous and protracted attacks upon the judge. The Circuit Court of Appeals stated (237 Fed. 986, 150 C. C. A. 636) by Judge Denison:

"Upon this record, the publications had reference to pending judicial action, and there is a finding of fact ('as alleged in the information') that they tended and were intended to provoke public resistance to an injunctional order, if one should be made, and there is a finding that they constituted an attempt to intimidate—at least unduly to influence—the district judge with reference to his decision in the matter pending before him."

And the Supreme Court (Chief Justice White; 247 U. S. 402, 415, 38 Sup. Ct. 560, 563 [62 L. Ed. 1186]) in its opinion quoted and approved this finding:

"That each of these findings is supported by competent evidence and for that reason binding upon this court is too clear for dispute; but we may rightly go further and say that it is difficult to see how any other findings could have been made."

In that case Justice White said further:

"The test, therefore, is the character of the act done and its direct tendency to prevent and obstruct the discharge of judicial duty—a conclusion which necessarily sustains the view of the statute taken by the courts below. * * *" 247 U. S. 419, 38 Sup. Ct. 564, 62 L. Ed. 1186.

The misbehavior must present an interruption which comes between the court and the consideration of the subject-matter then under submission in some way as to distract the mind of the court and pervert the course of justice, or even to divide the attention of the court. No such conclusion can be reached in the case at bar. When a case or application is finished, the courts are subject to the same criticism as other people. In the case of Patterson v. Colorado ex rel. the Attorney General, etc., 205 U. S. 454, 27 Sup. Ct. 556, 51 L. Ed. 879, 10 Ann. Cas. 689, Justice Holmes said:

"When a case is finished, courts are subject to the same criticism as other people, but the propriety and necessity of preventing interference with the course of justice by premature statement, argument or intimidation hardly can be denied."

[6] Was there a cause pending within the rule of contempt concerning libelous publications? A cause is pending when it is still open to modifications, appeal or rehearing and until the final judgment is rendered. Did the letter concern a cause pending? If it did not, it could not obstruct the administration of justice. The application before the court, which is the subject-matter of the letter, was the matter of a coreceiver. As to this the court had definitely decided adverse to the comptroller. The court's action was complete in respect to this matter. It is true there is added to his opinion opportunity for another

application, but this may well have been left unwritten. If a new application was made, even under suggestion of the opinion or the order, it would be necessary to do so as an entirely new application on new papers and facts. The leave granted was not one of reargument. At any time, upon a new showing, irrespective of the suggestion of the court, another application could have been made for the appointment of a coreceiver. Therefore the court's action was complete in every respect, and its order was entered when the letter was published.

This appears by the return of the writ. The district judge pointed out, as did the information, that the whole railroad situation was before the court, since it was an equity proceeding; but it is not of this that the defendant wrote. This is fully corroborated by the testimony of the defendant. He also testified that he had no intention of obstructing the delivery of justice or misbehaving himself so as to obstruct the administration of justice. He stands convicted upon his letter alone, and such inferences as may be drawn therefrom. His conviction rests upon an issue between the court and the defendant, and it is one of terminology or interpretation.

There is no criminal intent discoverable from this record to support the interpretation placed upon it by the court, nor was there pending sub judice a proceeding before the court at the time the letter was written. The conclusion is irresistible that the court exceeded its jurisdiction by an excess of power in adjudging the defendant guilty.

The petition for discharge is granted.

─────────
☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes