### Ex parte CRAIG.*

(Circuit Court of Appeals, Second Circuit. May 22, 1922.)

No. 308.

1. **Habeas corpus ⬮47(1)—Judge of Circuit Court of Appeals without jurisdiction to grant writs of habeas corpus.**

Under Act March 3, 1891, creating the Circuit Courts of Appeals and transferring the powers of the Circuit Court to the District Court, Act April 10, 1869, § 2, and Rev. St. § 607, relative to the powers of Circuit Judges, and Rev. St. §§ 751, 752 (Comp. St. §§ 1279, 1280), relative to habeas corpus, a judge of the Circuit Court of Appeals has no power to issue or grant a writ of habeas corpus.

2. **Habeas corpus ⬮113(12)—Presumed that Circuit Judge, in issuing writ, was acting as District Judge.**

As a Circuit Judge, designated to hold District Court, under Judicial Code, § 18 (Comp. St. § 985), had jurisdiction to issue writ of habeas corpus sitting as a District Judge, but was without such jurisdiction if

---

⬮For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari granted 258 U. S. ——, 43 Sup. Ct. 90, 67 L. Ed. ——.

sitting as a Circuit Judge, the presumption is that he was sitting as a District Judge, unless the contrary clearly appears. (Per Rogers, Circuit Judge.)

3. **Habeas corpus ⬳47(1)—Writ regarded as Issued under designation to hold District Court.**

Though Circuit Judge designated to hold District Court, in his opinion on application for writ of habeas corpus, expressed his belief that he had power as Circuit Judge to issue writs of habeas corpus, where he directed that the papers be filed with the clerk of the District Court and recorded in that court, the order will be regarded as made under his designation to hold District Court, and not as Circuit Judge. (Per Rogers, Circuit Judge.)

4. **Habeas corpus ⬳65—Writ, though granted by judge, should Issue from the court under its seal and be attested by clerk.**

Under Rev. St. §§ 751, 752 (Comp. St. §§ 1279, 1280), authorizing the courts to issue writs of habeas corpus, and the justices and judges thereof to grant such writs, though a judge grants the writ by giving permission for its issuance, it issues from the court, and should be under the seal of the court and attested by the clerk of the court. (Per Rogers, Circuit Judge.)

5. **Habeas corpus ⬳1—Object of writ stated.**

The object of the writ of habeas corpus is to secure the speedy release by judicial decree of persons illegally restrained of their liberty. (Per Rogers, Circuit Judge.)

6. **Habeas corpus ⬳94—Question after conviction is whether court had jurisdiction.**

After a judgment of conviction, the only question on habeas corpus is not whether the judgment was erroneous, but whether the court had jurisdiction to try the issue and render the judgment.

7. **Habeas corpus ⬳30(1)—When rule that judgment cannot be collaterally attacked for errors inapplicable stated.**

The general rule that a conviction and sentence cannot be collaterally attacked on habeas corpus for errors on the trial does not apply where treaty rights and obligations of the United States are involved, where subject or citizen of foreign state domiciled therein is in custody of state authorities for an act the validity and effect of which depend on the law of nations, where there is a conflict of jurisdiction, or where the authority or operations of the federal government are or may be interfered with by state action, where the petitioner is held under process based on state law violating United States Constitution, or where the judgment or order is in excess of the court's power. (Per Rogers, Circuit Judge.)

8. **Courts ⬳2—Jurisdiction over the person and over the subject-matter necessary.**

To render jurisdiction complete, court must have jurisdiction over the subject-matter and over the person, if the action is in personam. (Per Rogers, Circuit Judge.)

9. **Courts ⬳17—"Jurisdiction of the subject-matter" defined.**

"Jurisdiction of the subject-matter" is power to deal with the general subject involved in the action, or cognizance of the class of cases to which the one to be adjudicated belongs. (Per Rogers, Circuit Judge.)

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Jurisdiction (Of Courts).]

10. **Contempt ⬳34—Every superior court of record has power to punish.**

The right of every superior court of record to punish for contempt is inherent. (Per Rogers, Circuit Judge.)

11. **Contempt ⬳34—United States District Court has power to punish.**

Under the express provisions of Judicial Code, § 268 (Comp. St. § 1245), and under its inherent powers irrespective of statute, the United States District Court may punish for contempt. (Per Rogers, Circuit Judge.)

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**12. Contempt ☞3—Conduct directed against court's dignity and authority constitutes "criminal contempt."**

Conduct that is directed against the dignity and authority of a court constitutes a "criminal contempt." (Per Rogers, Circuit Judge.)

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Criminal Contempt.]

**13. Courts ☞21—Jurisdiction over person obtained either by service of process or by voluntary appearance.**

Jurisdiction of the person is acquired either by service of process within territorial limits of jurisdiction on defendant personally or by his voluntary appearance either in person or by attorney. (Per Rogers, Circuit Judge.)

**14. Contempt ☞72—Imprisonment within court's jurisdiction.**

Under Judicial Code, § 268 (Comp. St. § 1245), it was within the jurisdiction of the District Court to impose imprisonment for 60 days as punishment for criminal contempt. (Per Rogers, Circuit Judge.)

**15. Contempt ☞29—That offender is officer of a municipality charged with heavy responsibilities does not render him immune.**

That one guilty of conduct obstructing or interfering with the administration of justice in the courts is an officer of a great municipality, and as such charged with heavy responsibilities, does not render him immune from punishment as for criminal contempt. (Per Rogers, Circuit Judge.)

**16. Habeas corpus ☞4—That time for taking writ of error has expired is immaterial.**

On the question whether a judgment of conviction of criminal contempt can be set aside on habeas corpus, the fact that the time has gone by within which writ of error might have been taken is immaterial. (Per Rogers, Circuit Judge.)

**17. Habeas corpus ☞65—Writ not in proper form is a nullity.**

A paper purporting to be a writ of habeas corpus, but not issued by the court, as distinguished from a single judge, and returnable to it, and not under its seal and attested by its proper officer, is a nullity. (Per Hough, Circuit Judge.)

**18. Habeas corpus ☞4—Cannot be treated as writ of error.**

A writ of habeas corpus cannot be treated as a writ of error. (Per Hough, Circuit Judge.)

**19. Habeas corpus ☞79—Only facts not contradicting record may be shown.**

On return of writ of habeas corpus after trial, or equivalent proceeding, the court takes the recited facts as conclusive, and only facts not contradicting the record and proving lack of jurisdiction can be shown by way of traverse. (Per Hough, Circuit Judge.)

**20. Habeas corpus ☞79—Allegations of information for contempt and defendant's willfulness taken as true.**

On habeas corpus by one convicted of criminal contempt for publishing a letter attacking the conduct of the court in connection with a receivership, the allegations of the information must be taken as true, and it must be assumed that defendant acted with wrongful purposes charged. (Per Hough, Circuit Judge.)

**21. Habeas corpus ☞92(3)—Only question was whether conduct charged as contempt could as matter of law obstruct administration of justice.**

On habeas corpus by one convicted of criminal contempt for publishing a letter reflecting on the court's conduct in connection with a receivership, the only question was whether in point of law such act could possibly constitute an obstruction to the administration of justice, and the question whether in fact it would practically obstruct the administration of justice was not open. (Per Hough, Circuit Judge.)

Learned Hand, District Judge, dissenting.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Southern District of New York.

Habeas corpus by Charles L. Craig. From an order (274 Fed. 177) granting the writ, William C. Hecht, United States Marshal, appeals. Reversed, and petitioner remanded to the custody of the marshal.

See, also, 266 Fed. 230; 279 Fed. 900.

William Hayward, U. S. Atty., of New York City (David V. Cahill, Sp. Asst. U. S. Atty., of New York City, of counsel), for appellant.

John P. O'Brien, Corp. Counsel, of New York City (Edmund L. Mooney, Charles T. B. Rowe, Russell Lord Tarbox, and Frank I. Tierney, all of New York City, of counsel), for appellee.

Before ROGERS and HOUGH, Circuit Judges, and LEARNED HAND, District Judge.

ROGERS, Circuit Judge. The petitioner, Charles L. Craig, was during all the times herein involved, and still is, the comptroller of the city of New York, as well as a member of its board of estimate. It appears that on October 6, 1919, the petitioner Craig, as comptroller of the city of New York, addressed a letter to Hon. Lewis Nixon, in reply to a letter which Mr. Nixon had written to the comptroller inviting him to a conference in respect to the transportation situation in the city of New York. Mr. Craig's letter contained statements which criticized the conduct of the then District Judge Mayer, who had appointed a receiver of the Brooklyn Rapid Transit Company, the New York Municipal Railway Corporation, and the New York Consolidated Railroad Company. The receiver had taken possession of the assets of these roads and was operating the railways under the instruction and supervision of the court.

The New York State Public Service Commission for the First District moved the court for leave to intervene in the suit on behalf of the city of New York. At the same time the city of New York, through its corporation counsel, acting pursuant to a resolution of the board of estimate and apportionment, applied to the court for the appointment of Mr. Craig as coreceiver; he being, as comptroller, the chief financial officer of the city. The District Judge, Mayer, denied the motion for a coreceiver at that time without prejudice to its renewal at a subsequent time. Later certain other street railway corporations were also put in the hands of the receiver. The letter of Mr. Craig to Mr. Nixon, above referred to, among other things, said:

"Before any such conference can be seriously considered, and as an evidence of good faith on the part of those acting by and under the authority of the United States District Judge Mayer, there must be a reversal of the policy, for which Judge Mayer is responsible, of denying to myself and other members of the board of estimate and apportionment any access to original sources of information concerning the property and affairs of these various public utility corporations holding franchises to operate in the streets of New York."

Again it stated:

"Judge Mayer refused to grant any of the relief sought by the city. He not only denied the relief, but he made orders which preclude any application being made by the municipal authorities to any other court or judge for any

right of examination into the affairs or conditions of these corporations seeking municipal aid and favor. Truth is the mightiest weapon in every controversy. The orders of Judge Mayer deny to the municipal authorities the opportunity to ascertain the truth."

It concluded as follows:

"It seems to me a monstrous thing that an order of a federal judge in a court of equity should stand between the public and the truth under such circumstances. Such an order is hostile to every interest of the city of New York in these controversies. Its operation and effect is to disarm the municipal authorities, to deny them the most effective instrument of redress, and to force them into a contest with corporate powers. intrenched in darkness and concealment. The responsibility for the turmoil, delay, and dissatisfaction that has followed upon the orders of Judge Mayer, denying to the city of New York any representation in these receiverships, rests upon those who procure and are protected by such orders. As a first and preliminary evidence of good faith, those who desire such a conference and a reasonable solution of existing complications should procure the entry of orders by Judge Mayer putting the city of New York on an equal footing with the private interests active in the receiverships. A refusal to do this can but prolong and embitter the controversy, and it will not in the end procure any advantage whatever to the traction interests."

This letter Mr. Craig sent, not only to Mr. Nixon, but he is alleged to have caused its publication by sending it to the Public Service Commission and to the various newspapers published in the district. The result was that the United States attorney filed an information charging Mr. Craig with criminal contempt under section 268 of the Judicial Code (Comp. St. § 1245). The information set forth the statements in the letter which were alleged to be false, and that Craig had willfully, knowingly, unlawfully, and contemptuously made them. It alleged that the publication was calculated and intended by him to influence the court in the consideration of the suit in which the receiver was appointed and in proceedings then pending. It also alleged that the purpose was to intimidate the court, and to force and compel it to decide applications and questions in issue in accordance with Craig's wishes. It also alleged that the letter was written for the purpose of inciting public ridicule, scorn, and condemnation if the court's decisions were contrary to or at variance with the views and wishes of the defendant. It further alleged that it tended to obstruct and impede the administration of justice in said suits and proceedings.

A demurrer was interposed, which was overruled in an opinion which can be found in 266 Fed. 230, and the defendant was held to answer in contempt before Judge Mayer. The trial was commenced on May 10, 1920, and was concluded on June 10, 1920. Every consideration seems to have been given to counsel, and briefs were not submitted until October 30, 1920, and Judge Mayer reserved his decision until February 14, 1921. He appears to have given great consideration to the questions involved, filing a full and comprehensive opinion, which can be found in 279 Fed. 900. The opinion concluded as follows:

"The United States attorney is directed to submit to the court, on two days' notice to counsel for defendant, a proposed order in accordance herewith, which shall also provide that the defendant shall appear before the court in Court Room 331, of the Old Post Office Building on February 24, 1921, at 2 p. m., at which time such further proceedings will be had as may be proper.

The defendant is not only the incumbent of a high office but is also a member of the bar of this court. It is manifestly his duty to do all in his power to repair the wrong he has done. It is not a wrong with which the judge concerns himself in a personal sense and for that reason no personal apology is desired nor required. The wrong has been perpetrated against the administration of justice. The reparation which is within the power of the defendant is promptly to make and file in the office of the clerk of the court an unqualified retraction of the false statements respecting the court, referred to in paragraphs 1, 2, 3, and 4 of the information."

It seems that Mr. Craig was given full opportunity to make retraction of what the District Judge found to be "false charges," the effect of which he also found tended to "obstruct the administration of justice." But Mr. Craig did not avail himself of the opportunity to make the retraction demanded and on February 24, 1921, the United States Attorney moved for sentence, and the court pronounced judgment and sentenced the defendant to be imprisoned for a term of 60 days, sentence to be executed at the Essex county jail, Newark, N. J.; the Attorney General of the United States having previously designated that as the place of confinement for defendants sentenced in the Southern district of New York for terms of less than 6 months.

On the same day that sentence was pronounced an application was made to one of the Circuit Judges in this circuit for a writ of habeas corpus, and the writ was signed and issued by him on the same day. It appears that the Circuit Judge who issued the writ had been duly designated by the Senior Circuit Judge of the circuit to hold a session of the District Court for the Southern District of New York for the hearing of such business as might come before him during the period between February 21, 1921, and, ending March 5, 1921. Whether in awarding the writ he was acting in his capacity as a Circuit Judge, or in that of District Judge under the designation referred to, seems to be one of the controverted questions in the case.

The petition for the writ was addressed to the judge as "Circuit Judge of the United States." The writ of habeas corpus required the production of the defendant before the United States Circuit Judge, and is signed by the judge, who placed under his signature the letters "U. S. C. J.," and nothing therein is said as to his sitting or acting as a District Judge. The first paragraph of his very comprehensive opinion, which can be found in 274 Fed. 177, and which was rendered on April 29, 1921, and in which he sustained the writ and directed the defendant's discharge, was as follows:

"The power of a Circuit Judge to issue a writ of habeas corpus is questioned by a motion to dismiss. I have held heretofore that a Circuit Judge has such power. In re David Lamar, 274 Fed. 160. Nothing has been submitted in this proceeding which causes me to change the views there expressed. Further, at the time of the issuance of this writ, the Circuit Judge writing was by assignment empowered to consider matters of original jurisdiction. The application to dismiss the writ for want of authority to issue the same is denied."

[1] A judge of the Circuit Court of Appeals is, in our opinion, without power either to grant or to issue a writ of habeas corpus. The Circuit Court of Appeals is a court created by statute and is not endowed with any original jurisdiction. It was established by the Act

of March 3, 1891, 26 Stat. c. 517, p. 826. It is only a court of appeal. The act does not in terms grant to this court authority to issue the writ. It is given authority to "exercise appellate jurisdiction to review by appeal or by writ of error final decisions in the District Court and the existing Circuit Courts in all cases." And the Supreme Court has held that a Circuit Court of Appeals is not authorized to issue original and independent writs of habeas corpus. Whitney v. Dick, 202 U. S. 132, 137, 26 Sup. Ct. 584, 50 L. Ed. 963.

If the Circuit Court of Appeals, as such, is without the power is it possessed by a judge of the court acting solely as such? We are satisfied that he does not possess it. A judge of the Circuit Court of Appeals, like the court itself, has no authority except that conferred by statute. And no act of Congress empowers him to grant or to issue a writ of habeas corpus. Section 751 of the Revised Statutes (Comp. St. § 1279) provides:

"The Supreme Court and the Circuit and District Courts shall have power to issue writs of habeas corpus."

And section 752 (Comp. St. § 1280) provides:

"The several justices and judges of the said courts, within their respective jurisdictions, shall have power to grant writs of habeas corpus for the purpose of an inquiry into the cause of restraint of liberty."

The Circuit Courts, referred to in section 751, were the Circuit Courts established by the Judiciary Act of September 24, 1789, and which were abolished by the Act of March 3, 1911, 36 Stat. c. 231, § 289, p. 1167 (Comp. St. § 1266).

The judges embraced within the language of section 752 were from 1789 to 1869 the Circuit Justices of the Supreme Court assigned to hold the Circuit Courts and judges of the District Court. By section 2 of the Act of April 10, 1869, the office of Circuit Judge was created, (16 Stat. p. 44), and that act conferred on the Circuit Judge for his circuits the same power and jurisdiction therein as the justice of the Supreme Court allotted to the circuit. And section 607 of the Revised Statutes conferred similar authority in the same language, which continued in force until repealed in explicit terms by the Act of March 4, 1911, already referred to, and which transferred the powers of the Circuit Court to the District Court. The Circuit Court and the Circuit Court of Appeals were two absolutely distinct courts, and a judge of the Circuit Court and a judge of the Circuit Court of Appeals, were equally distinct. And a judge of the Circuit Court of Appeals, as such, has never been invested with the power to grant a writ of habeas corpus which was possessed by a judge of the Circuit Court. And no one of the judges now constituting the Circuit Court of Appeals is now or ever has been a judge of the Circuit Court within the meaning of section 752 of the Revised Statutes, and no one of them is possessed of the power to grant writs of habeas corpus.

[2, 3] But, while a judge of the Circuit Court of Appeals; as such, has no power to issue the writ of habeas corpus, a judge of the District Court has such power by virtue of sections 751 and 752 of the Revised Statutes hereinbefore set forth. As the judge when he issued the writ, so called, and granted the discharge, had been designated and appointed

under section 18 of the Judicial Code (Comp. St. § 985) to hold a session of the District Court for the Southern District of New York for the hearing and disposition of such business as might come before him within the period specified in his appointment, it is clear that he had power to grant a writ of habeas corpus at the time he acted in this matter—provided he acted as a District Judge. As he had jurisdiction sitting as a District Judge, and was without jurisdiction if sitting as a Circuit Judge, the presumption is that he, in doing what he did, was sitting as a District Judge, unless it clearly appears to the contrary. The statement of his belief in the opinion which he filed that he possessed the power to act in his capacity as a Circuit Judge is not of controlling significance.

Particularly is this so because he also, in the same connection, refers to the fact that in the issuance of the writ he had been empowered to consider matters of original jurisdiction. Whatever doubt one might otherwise entertain as to the capacity in which he was acting at the time seems to be put at rest by the order which he made, and which required "that the papers in this proceeding be filed with the clerk of the United States District Court for the Southern District of New York," and that they "be recorded in said court." As a judge of the Circuit Court of Appeals he would not have directed the papers to be filed with the clerk of the District Court and that they be recorded in that court, but would have filed them in the office of the clerk of his own court and ordered them to be there recorded. The order sustaining the writ and ordering the discharge of Craig, and which the judge ordered recorded in the District Court, and which is the order appealed from, must be regarded as made by him under his designation to hold the District Court for the Southern District of New York; and as such an appeal from that order was properly taken to this court.

[4] Before we pass to a consideration of the merits of the case itself, we deem it proper to refer to what appears in the transcript under the designation "Writ of Habeas Corpus," but which in reality does not correspond with what we understand to be such a writ. In commenting upon the writ as printed in the present record, it is necessary to have in mind the language of sections 751 and 752 already quoted, and to note the distinction made therein between the power to issue and the power to grant. Section 751 gives to the *courts* named therein the power to *issue* the writ. And section 752 gives to the *judges* of the courts specified the power to *grant* the writ. To grant the writ is to give permission for its issuance. When that permission is given it issues from the court. And when so issued it has the test of the clerk as well as the seal of the court. But in the case now before us this so-called writ of habeas corpus does not appear to have issued from any court. No seal of any court is affixed to it. And the name of the clerk of no court attests it. The statute of 31 Car. II expressly provided that the writ should be under the seal of the court whereof the judge granting the writ is a member.

It is our understanding that a writ of habeas corpus, like a writ of error, or a writ of certiorari, or a writ of mandamus, should be issued under the seal of the court. In the United States the writ always runs

in the federal courts in the name of the President of the United States, and in the state courts in the name of the state or the people. Church on Habeas Corpus (2d Ed.) § 110. But in this case the writ did not run either in the name of the President, or in that of anybody else. And it was not addressed to the United States marshal, or to anybody else. We, however, do not need now to inquire as to what legal validity the writ originally possessed, as it appears to have been treated by all the parties as valid, and no objection was raised concerning it at the argument in this court.

[5] This brings us to inquire as to the use made of the writ of habeas corpus. The object of that writ is to secure the speedy release by judicial decree of persons who are illegally restrained of their liberty. The writ has long been justly esteemed the great bulwark of personal liberty, since it is the proper remedy to ascertain whether the individual is lawfully deprived of his liberty, and by its means, if no lawful ground of his detention appears, he is entitled to an immediate discharge. In this case the petitioner for the writ had been convicted of a criminal offense, a criminal contempt, and sentenced to imprisonment. He sought to obtain his release, and to defeat his conviction and sentence, by means of a writ of habeas corpus.

In the important case of Brass Crosby, Lord Mayor of London, 3 Wilson, 188, an application was made in 1771 to the Court of Common Pleas for a writ of habeas corpus to bring up the body of the Lord Mayor of London, who had been committed for contempt by the House of Commons. The habeas corpus was granted, and upon the return the causes of contempt for which the party was committed were set forth. It was fully argued and at considerable length that the House of Commons had no authority to commit for a contempt, and, if they had that power, that they had used it wrongfully in that instance, and that the causes assigned were insufficient. The whole court decided that the House of Commons had power to commit for contempt; and that the court could not revise its adjudication.[1] Lord Chief Justice De Grey, at the conclusion of the argument, stated that, if either he or any of his brethren on the Bench had any doubt about the matter, they would certainly have taken time to consider before giving their opinions, but that the case seemed so very clear that there was no reason for delay, and they thereupon proceeded to state their opinions. The Chief Justice stated his opinion at some length and in the course of it declared that—

"When the House of Commons adjudged anything to be a contempt, or a breach of privilege, their adjudication is a conviction and their commitment, in consequence, is execution; and no court can discharge on bail, a person that is in execution by the judgment of any other court. The House of Commons, therefore, having an authority to commit, and that commitment being an execution, what can this court do? *It can do nothing, when a person is in execution by the judgment of a court having a competent jurisdiction.* In such a case, this court is not a court of appeal."

[1] In Kilbourn v. Thompson, 103 U. S. 168, 26 L. Ed. 377, which was an action for false imprisonment, the Supreme Court considered the power of the Houses of Congress to punish for contempt, and pointed out the distinction between the Houses of the English Parliament and the Houses of Congress in this respect. See, also, Marshall v. Gordon, 243 U. S. 521, 37 Sup. Ct. 448, 61 L. Ed. 881, L. R. A. 1917F, 279, Ann. Cas. 1918B, 371.

All four of the justices agreed, and Mr. Justice Blackstone, in his concurring opinion, said:

"All courts, by which I mean to include the two Houses of Parliament, and the courts of Westminster Hall, can have no control in matters of contempt. The sole adjudication of contempt, and the punishment thereof, belongs exclusively, and without interfering, to each respective court. Infinite confusion and disorder would follow, if courts could, by writs of habeas corpus, examine and determine the contempt of others."

The above case was approvingly commented upon and its doctrine followed in 1822 by the Supreme Court in Ex parte Kearney, 7 Wheat. 38, 5 L. Ed. 391. The court in its opinion, which was written by Mr. Justice Story, after referring to the Brass Crosby Case, said:

"So that it is most manifest, from the whole reasoning of the court in this case, that a writ of habeas corpus was not deemed a proper remedy, where a party was committed for a contempt by a court of competent jurisdiction, and that, if granted, the court could not inquire into the sufficiency of the cause of commitment."

Again:

"The only objection is, not that the court acted beyond its jurisdiction, but that it erred in its judgment of the law applicable to the case."

This the court decided it could not do, and it denied the writ.

In 1830, in Ex parte Tobias Watkins, 3 Pet. 193, 7 L. Ed. 650, the Supreme Court refused an application for a writ of habeas corpus; it appearing that the prisoner was confined in jail by virtue of a judgment of a Circuit Court of the United States which judgment was claimed to be erroneous. Chief Justice Marshall, speaking for the court, said:

"An imprisonment under a judgment cannot be unlawful, unless that judgment be an absolute nullity; and it is not a nullity if the court has general jurisdiction of the subject, although it should be erroneous. The Circuit Court for the District of Columbia is a court of record, having general jurisdiction over criminal cases. An offense cognizable in any court is cognizable in that court. If the offense be punishable by law, that court is competent to inflict the punishment. The judgment of such a tribunal has all the obligation which the judgment of any tribunal can have. To determine whether the offense charged in the indictment be legally punishable or not is among the most unquestionable of its powers and duties. The decision of this question is the exercise of jurisdiction, whether the judgment be for or against the prisoner. The judgment is equally binding in the one case and in the other, and must remain in full force, unless reversed regularly by a superior court capable of reversing it."

And the method of reversing the judgment is by writ of error, and not through a writ of habeas corpus.

The Supreme Court has consistently adhered to the principle announced in these early cases. Thus in Matter of Gregory, 219 U. S. 210, 31 Sup. Ct. 143, 55 L. Ed. 184, where the person applying for the writ had been convicted of a crime in the Police Court of the District of Columbia, Mr. Justice Hughes, speaking for the court, said:

"In hearing this application, this court does not sit to review the correctness of the conclusion of the Police Court as to the violation of the statute by the petitioner, or of the decision of the Court of Appeals of the District as to the sufficiency of the information filed against him. The question here is not one of guilt or innocence, but simply whether the court below

had jurisdiction to try the issues; and, as we find that the statute conferred that jurisdiction, the application for a writ of habeas corpus must be denied."

[6] The principle is therefore as thoroughly established as any in the law that in applications for a writ of habeas corpus, if it appears that there has been a judgment of conviction, the only question to be considered is not whether the judgment was erroneous, but whether the court had jurisdiction to try the issue and to render the judgment. See Ex parte Parks, 93 U. S. 18, 23 L. Ed. 787; Ex parte Yarbrough, 110 U. S. 651, 4 Sup. Ct. 152, 28 L. Ed. 274; In re Coy, 127 U. S. 731, 8 Sup. Ct. 1263, 32 L. Ed. 274; Gonzales v. Cunningham, 164 U. S. 612, 17 Sup. Ct. 182, 41 L. Ed. 572; In re Eckert, 166 U. S. 481, 17 Sup. Ct. 638, 41 L. Ed. 1085; Hyde v. Shine, 199 U. S. 62,.83, 25 Sup. Ct. 760, 50 L. Ed. 90; Whitney v. Dick, 202 U. S. 132, 136, 26 Sup. Ct. 584, 50 L. Ed. 963; Keizo v. Henry, 211 U. S. 146, 148, 29 Sup. Ct. 41, 53 L. Ed. 125.  And see Harlan v. McGourin, 218 U. S. 442, 448, 31 Sup. Ct. 44, 47 (54 L. Ed. 1101, 21 Ann. Cas. 849), where it is said that—

"Upon habeas corpus the court examines only the power and authority of the court to act, not the correctness of its conclusions."

The rule is correctly laid down in 17 Am. & Eng. Encyc. of Law, p. 1059, where it is said:

"A conviction and sentence for a criminal offense cannot be collaterally attacked in habeas corpus proceedings for errors and irregularities not affecting the jurisdiction.  But, if a person is restrained of his liberty under an order or judgment which is void for want of jurisdiction, habeas corpus will lie."

In Henry v. Henkel, 235 U. S. 219, 35 Sup. Ct. 54, 59 L. Ed. 203, decided in 1914, the court declared that, subject to certain exceptions, it had—

"uniformly held that the hearing on habeas corpus is not in the nature of a writ of error, nor is it intended as a substitute for the functions of the trial court.  Manifestly, this is true as to disputed questions of fact, and it is equally so as to disputed matters of law, whether they relate to the sufficiency of the indictment or the validity of the statute on which the charge is based. These and all other controverted matters of law and fact are for the determination of the trial court.  If the objections are sustained, or if the defendant is acquitted, he will be discharged.  If they are overruled, and he is convicted, he has the right of review."

Again the court said:

"Neither the issue nor the basis of the decision is changed when the person held under the warrant applies to a District Judge for discharge on writ of habeas corpus.  So likewise the same issue and the same rule of decision must govern when the case is here on appeal from the order of the habeas corpus tribunal."

This court in a recent opinion, now published, and concurred in by the judge who entered the order now before the court on this appeal (United States ex rel. Meyer Ripstein v. James M. Power, 279 Fed. 735), has held that a writ of habeas corpus cannot be used to review the weight of evidence, but is confined to the single point of jurisdiction. And so in a recent decision of the Court of Appeals in New York it was declared that habeas corpus only tests the mandate under which the prisoner is held, and is not a substitute for a trial to determine inno-

cence. People v. Atwell, 232 N. Y. 96, 133 N. E. 364 (decided November 22, 1921).

In Cooley's Constitutional Limitations, p. 347, that eminent authority notices the fact that the writ has sometimes been attempted to be used as if it were a writ of error, under which errors and irregularities of other judges and courts could be corrected. Judge Cooley declares that:

" * * * Any such employment of the writ is an abuse. Where a party who is in confinement under judicial process is brought up on habeas corpus, the court or judge before whom he is returned will inquire: (1) Whether the court or officer issuing the process under which he is detained had jurisdiction of the case, and has acted within that jurisdiction in issuing such process. If so, mere irregularities or errors of judgment in the exercise of that jurisdiction must be disregarded on this writ, and must be corrected, either by the court issuing the process, or on regular appellate proceedings. * * * "

[7] There are exceptions to the general rule that a conviction and sentence for a criminal offense cannot be collaterally attacked in a habeas corpus proceeding for errors committed upon the trial. The exceptions to that rule are as follows:

(1) Where the, rights or obligations of the United States under a treaty are involved, or where a subject or citizen of a foreign state and domiciled therein is in custody by state authority for an act done or omitted, the validity and effect of which depend upon the law of nations. See Ex parte Royall, 117 U. S. 241, 251, 6 Sup. Ct. 734, 29 L. Ed. 868; Cunningham v. Neagle, 135 U. S. 1, 71, 74, 10 Sup. Ct. 658, 34 L. Ed. 55; In re Mayfield, 141 U. S. 107, 11 Sup. Ct. 939, 35 L. Ed. 635; Boske v. Comingore, 177 U. S. 466, 20 Sup. Ct. 701, 44 L. Ed. 846; In re Lincoln, 202 U. S. 178, 180–182, 26 Sup. Ct. 602, 50 L. Ed. 984.

(2) Where there is a conflict of jurisdiction between a state and the United States, or where the authority and operations of the federal government are or may be interfered with by state action. See Tarble's Case, 13 Wall. 397, 20 L. Ed. 597; Tennessee v. Davis, 100 U. S. 257, 25 L. Ed. 648; Cunningham v. Neagle, supra; In re Watts, 190 U. S. 1, 27, 23 Sup. Ct. 718, 47 L. Ed. 933.

(3) Where the petitioner is held under state process based upon a state law, which is in violation of the Constitution of the United States. See Ex parte Royall, 117 U. S. 241, 247–250, 252, 253, 6 Sup. Ct. 734, 29 L. Ed. 868.

(4) Where the judgment or order, under which the petitioner is held is void because in excess of the power of the court. See Ex parte Lange, 18 Wall. 163, 175–177, 21 L. Ed. 872; Hans Nielson, 131 U. S. 176, 9 Sup. Ct. 672, 33 L. Ed. 118; Ex parte Hudgings, 249 U. S. 378, 39 Sup. Ct. 337, 63 L. Ed. 656, 11 A. L. R. 333.

In the case now before us for decision, great reliance is placed by the petitioner upon the case last cited. We are, however, unable to see that any analogy exists between that case and this. In Ex parte Hudgings, the District Judge, while presiding at a trial concluded, while the witness was on the stand giving his testimony, that he was committing perjury by asserting and reiterating that he could not recall having seen certain persons write, although he had frequently associated with

them. He testified that he had often seen the writing of the persons named, and thought the writings shown him were theirs, but that he could not so state from having seen them write, as he could not recollect ever having seen them do so. The court interrupted the examination by saying:

"This witness is going to be committed for contempt of court. The court is thoroughly satisfied, Mr. Witness, that you are testifying falsely when you say that you cannot recall of ever seeing Mr. MacMillan write, and this has happened several times during this trial with other witnesses, especially with your wife. * * * And it becomes the plain duty of the court to commit you to jail, sir, for contempt, and, before doing so, I think it is the duty of the court to explain to you that the answer, 'I do not remember of ever having seen him write,' is just as false, is just as much contempt of court, if you have seen him write, as it would be for you to say that you had never seen him write, without using the expression, 'I do not remember.'"

The court also said:

"I am not going to allow you to obstruct the course of justice here, and if this nation has delegated power enough to this court, and I am very sure, it has, to deal with you in the manner proposed, I am going to do it."

Before the discharge of the witness from the stand an order for contempt against him was made and he was committed to the custody of the marshal.

The Supreme Court held the commitment *void* for excess of power, and therefore ordered the petitioner discharged. It held that perjury in facie curiæ is not of itself punishable as contempt apart from its obstructive tendency. It declared that obstruction to the performance of judicial duty resulting from the act done is the characteristic upon which the power to punish for contempt must rest, and that the presence of that element must clearly be shown, and that false swearing does not necessarily have an inherent obstructive effect. And the court pointed out that—

"If the conception [that it necessarily had such an effect] were true, it would follow that, when a court entertained the opinion that a witness was testifying untruthfully, the power would result to impose a punishment for contempt, with the object or purpose of exacting from the witness a character of testimony which the court would deem to be truthful, and thus it would come to pass that a potentiality of oppression and wrong would result, and the freedom of the citizen when called as a witness in a court would be gravely imperiled."

We have referred to this case at length because of its remarkable and exceptional character. The case stands by itself and is properly regarded as sui generis. It affords no precedent for the claim put forward by the petitioner in support of the order appealed from. In the Hudgings Case, without proof of guilt, without any evidence, without any hearing, the court forthwith ordered the imprisonment of the witness for an indefinite term, and until he should purge himself of the alleged contempt by testifying flatly the reverse of what he had stated to be the truth. In the instant case the District Judge certainly did not proceed summarily in imposing sentence upon the petitioner, as in the Hudgings Case, inasmuch as about 17 months intervened between the commission of the act of contempt and the issuance of an order of commitment, while in the Hudgings Case, before the witness had left the

stand, he was committed to the custody of the marshal. In the present case sentence was imposed at the end of legal proceedings of a thorough and deliberate nature, and in which the fullest inquiry was made into all the facts, including the question as to whether the publication complained of tended to obstruct the administration of justice, and the trial court found as a fact that the tendency and effect of the publication were to obstruct the administration of justice. The testimony taken at the trial covers 600 printed pages, and 100 pages more are taken up with the exhibits.

Moreover, we may point out that what was done in the Hudgings Case was done at least by a court empowered to review and set aside erroneous judgments in appropriate proceedings, while in the instant case it was done by a single judge, clothed with no authority to revise or set aside erroneous judgments, except when acting with those associated with him in the court of which he is a member. In granting the writ and discharging Craig, he was acting alone and as a District Judge, and his authority was exactly coextensive with that possessed by the judge whose action he sought to exercise appellate jurisdiction over, and whose errors he assumed to sit in judgment upon and to correct. The two cases thus present a marked contrast, and the one affords no authority for the other.

We do not find it necessary to review in detail the other cases relied upon by the petitioner. It suffices to say that the cases will be found to fall within the exceptions to the general rule heretofore stated in this opinion, and therefore inapplicable to the facts of the case under consideration.

We find no reason why this case is not governed by the general rule that a habeas corpus proceeding cannot be used as a writ of error but must be limited to jurisdictional questions. The procedure before Judge Mayer was in conformity with settled practice with respect to the subject-matter of which the District Court had jurisdiction. No question of international law or of treaty obligations was involved; there was no conflict in jurisdiction between the state and federal authorities; there was no state interference with the operations of the general government; the constitutionality of no state law was assailed; the power of the court under section 268 of the Judicial Code was not exceeded.

This examination of the cases shows that the sole question which could be considered in the habeas corpus proceedings was as to the jurisdiction of the District Judge. If he had jurisdiction of the person of the petitioner, Craig, and jurisdiction of the subject and authority to render the judgment which he pronounced, there was no right to inquire further in the habeas corpus proceedings, and no right to determine whether or not, in the exercise of that jurisdiction, the District Judge had committed error. If errors were committed, the law afforded a remedy therefor, but not by habeas corpus. So that the question therefore narrows itself down to this: Did Judge Mayer have jurisdiction to render the judgment he pronounced upon Craig?

[8-10] To render the jurisdiction of a court complete, it must have jurisdiction over the subject-matter, and over the person, if the action

is in personam, as in the present case. Jurisdiction of the subject-matter is the power to deal with the general subject involved in the action. In other words, the court must have cognizance of the class of cases to which the one to be adjudicated belongs. And the subject-matter concerning which we must inquire is as to the right of the District Court to punish for a contempt of its authority. The right of every superior court of record to punish for contempt is inherent from the very nature of its organization, and is essential to its existence and protection, and to the proper administration of justice. Anderson v. Dunn, 6 Wheat. 204, 5 L. Ed. 242; United States v. Hudson, 7 Cranch, 32, 3 L. Ed. 259; Ex parte Kearney, 7 Wheat. 40, 5 L. Ed. 391. In Ex parte Robinson, 19 Wall. 505, 22 L. Ed. 205, the court said:

"The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power."

And in Blackstone's Commentaries, vol. 4, p. 286, the great English commentator wrote:

"Laws without a competent authority to secure their administration from disobedience and contempt would be vain and nugatory. A power, therefore, in the supreme courts of justice to suppress such contempts by an immediate attachment of the offender results from the first principles of judicial establishments, and must be an inseparable attendant upon every superior tribunal. Accordingly we find it actually exercised as early as the annals of our law extend."

[11] A United States District Court is a court of record of superior jurisdiction within the rule above stated, and as such it has, irrespective of statute, an inherent power to punish for contempt. An act of Congress, declaratory of the law, has, however, expressly provided as follows:

"The said courts [United States Courts] shall have power * * * to punish, by fine or imprisonment, at the discretion of the court, contempts of their authority: Provided, that such power to punish for contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice. * * *" Judicial Code, § 268 (36 Stat. 1163 [Comp. St. § 1245]).

It cannot be claimed, therefore, that the District Court was without jurisdiction of the subject-matter of the contempt.

[12] Conduct that is directed against the dignity and authority of a court constitutes a criminal contempt of the court. And it has been held that a publication, pending a trial, which reflects upon the court, counsel, parties, or witnesses, respecting the cause, constitutes a contempt. Hollingsworth v. Duane, Fed. Cas. No. 6,616; United States v. Duane, Fed. Cas. No. 14,997; In re Bronson, 12 Johns. (N. Y.) 460; Bloom v. People, 23 Colo. 416, 48 Pac. 519; People v. Wilson, 64 Ill. 195, 16 Am. Rep. 528.

Courts of record of superior jurisdiction possess inherent power to punish for contempt of court. Middlesex Sheriff's Case, 11 A. & E. 273; Rex v. Davison, 4 B. & Ald. 329; Rhinehart v. Lance, 43 N. J. Law, 311, 39 Am. Rep. 592; Cartwright's Case, 114 Mass. 230; In re Chadwick, 109 Mich. 588, 67 N. W. 1071; Tyler v. Hamersley, 44 Conn. 393, 26 Am. Rep. 471; Coleman v. Roberts, 113 Ala. 323, 21 South.

449, 36 L. R. A. 84, 59 Am. St. Rep. 111; Bradley v. State, 111 Ga. 168, 36 S. E. 630, 50 L. R. A. 691, 78 Am. St. Rep. 157; In re Rosenberg, 90 Wis. 581, 63 N. W. 1065, 64 N. W. 299. The existence of such a power in the court is essential to the due administration of justice.

[13] It is equally clear that the court had jurisdiction over the person of Craig. Jurisdiction of the person is acquired either by the service of process within the territorial limits of the jurisdiction upon the defendant personally, or by his voluntary appearance either in person or by attorney. It appears that Craig was duly served with process, and it is not necessary to inquire further. But as matter of fact he appeared also by counsel and personally. He entered a plea of not guilty and testified on his own behalf, and his testimony alone occupies 150 printed pages of the record.

[14] The judgment imposed—imprisonment for 60 days—was within the court's jurisdiction; for the section of the Judicial Code already set forth expressly declares that the court shall have power to punish "by fine or imprisonment" in its discretion.

[15] The fact that the person involved happens to be an officer of a great municipality, and as such is charged with heavy responsibilities, does not affect the question presented to this court, and which must now be decided. So far as the question of law now presented to this court is concerned, his status is not different from that of the humblest individual in the land. The law is no respector of persons, and no man can. obstruct or interfere with the administration of justice in the courts. As was well said in Chisholm v. Georgia, 2 Dall. 419, 466 (1 L. Ed. 440):

"Causes, and not parties to causes, are weighed by Justice, in her equal scales; on the former solely, her attention is fixed; to the latter, she is, as she is painted, blind."

[16] The legal question involved in these proceedings is not to be obscured by confusing the issue which is now presented to us by any discussion concerning whether the court below in the exercise of its jurisdiction committed errors which the law required the correction of by other methods than the one which was adopted. And we think the question now presented must be determined without reference to whether the time has gone by within which a writ of error might have been taken. That has nothing to do with the question which we have to decide.

Moreover, if this court is in error in the conclusion at which the majority of the court has arrived, it is by no means impossible that the Supreme Court can correct any mistake we may have made.

The order appealed from is reversed, and the appellee is remanded to the custody of the appellant.

HOUGH, Circuit Judge (concurring). Substantially as to reasoning, and wholly in result, I agree with ROGERS, Circuit Judge. This memorandum is filed to emphasize my view that the order appealed from must be set aside because (1) it is but a part of a void proceeding; but (2) even assuming a valid procedure, the court below exceeded its powers in habeas corpus.

[17] As to the first point: The paper writing upon which this proceeding rests is not a writ of habeas corpus. A document to be entitled to the name of writ must be issued by a court and be returnable to the same; it must be under seal and tested by the proper officer. The writing that initiated this matter was no more than the personal direction of a single judge.

Habeas corpus is but one of the writs well known in a practice regulated by the Legislature, but originating in and interpreted by the rules of the common law. The requisites of a valid writ are stated in Re Kaine, 14 How. at page 119, 14 L. Ed. 345. The so-called writ in this instance was a nullity, as much as would be a document similarly formed and called a writ of venditioni exponas or other familiar process.

I entirely agree with the remarks of Judge ROGERS in respect of the power or lack of power of a Circuit Judge to grant, issue, or allow genuine writs of habeas corpus. While, therefore, I regard the proceedings below as merely null, I join the rest of the court in considering the matters argued, as though a Circuit Judge duly qualified to hold, and holding, a District Court had allowed a writ of habeas corpus to issue out of that court and (upon the return of said writ) directed the relator to be discharged.

[18] As to the second point above stated: The general rule expressed in all the cases is undoubted, viz. that habeas corpus cannot be treated as a writ of error; the scope of its inquiry is limited to an investigation of the jurisdiction of that tribunal or magistrate or other person whose action, order, judgment, sentence, or decree has resulted in depriving the relator of liberty.

[19] It follows that upon hearing on return of writ, after any trial or equivalent proceeding, the court acts after "taking the recited facts as conclusive truth" (In re Savin, 131 U. S. 267, at page 276, 9 Sup. Ct. 699, 33 L. Ed. 150), and the only facts that can be shown by the relator, by way of traverse, are those "not contradicting the record (which) prove lack of jurisdiction" (In re Cuddy, 131 U. S. 280, 9 Sup. Ct. 703, 33 L. Ed. 154). This limited investigation the appellee herein deliberately chose; for he might have brought a writ of error and procured the full review of both law and facts fully illustrated by the history through all the courts of Toledo, etc., Co. v. United States, 247 U. S. 402, 38 Sup. Ct. 560, 62 L. Ed. 1186.

It follows, therefore, that the first legal inquiry in this case is: What is meant by jurisdiction? That the word is plastic in the usage of the Supreme Court of the United States is certainly true; it must be admitted that, where an examination of the record shows "no legal evidence to sustain a conviction," lack of jurisdiction exists (In re Watts, 190 U. S. 1, 23 Sup. Ct. 718, 47 L. Ed. 933); and where deprivation of liberty results from an excess of judicial power there is a similar lack (In re Hudgings, 249 U. S. 378, 39 Sup. Ct. 337, 63 L. Ed. 656, 11 A. L. R. 333). But always the court, when considering a habeas corpus, must take the record for verity, except in so far as new matter attacks the jurisdiction of the sentencing court.

[20] There is no new matter in this record attacking jurisdiction; what really happened was that the case was tried over again, and the

so-called writ was no more than a device for obtaining a new trial. I take the record as binding upon the following vital point, viz.: The allegations of the information must be held to be true, and the like assumption also made that what this appellee did, said, and wrote was done willfully and with the wrongful purposes charged by the indictment.

[21] Thus there remains but one question: Is it possible in point of law (not in point of fact; that is settled for us by the original findings) for the wrongfully intended acts of the appellee to constitute an "obstruction to the administration of justice"? Neither this court nor the judge presiding upon a return in habeas corpus is or was entitled to answer this question as one of fact; and this court has not, and the lower court had not, any right to review the facts and render a verdict of not guilty on the ground that the action of the appellee would not practically obstruct the administration of justice.

We are bound to consider no more than the single question whether such conduct with such intent could in point of law obstruct the administration of justice. It is my opinion that this question is answered in the affirmative by Toledo, etc., Co. v. United States, supra. Therefore I think the order complained of should be reversed (1) for the nullity (not the irregularity) of the so-called writ; and (2) because, had the process been proper, habeas corpus did not justify the inquiry upon which the lower court embarked.

LEARNED HAND, District Judge (dissenting). The appealability of the order is settled already, and with it appears to me to go the question whether it was an order of the District Court, since otherwise this court would have no jurisdiction. Therefore the questions are: What matters does the writ of habeas corpus review? and what are their merits?

All the books agree that the writ goes only to points of "jurisdiction," so that, if that word were definite, there would be no doubts. Unhappily it is not. Generally it means that the offense which the court decides to have been committed was one which it had power to determine. That is probably the exclusive original meaning. Ex parte Watkins, 3 Pet. 193, 7 L. Ed. 650; Ex parte Kearney, 7 Wheat. 38, 5 L. Ed. 391; Ex parte Parks, 93 U. S. 18, 23 L. Ed. 787. If so, it is enough that the court has said that it was punishing an offense within its powers; the question is not open whether there was any basis in fact for such an assertion.

Yet this is certainly not without exception the law in federal courts. For example, it was in post-bellum times repeatedly held that, when the court was acting under an unconstitutional statute, the writ might raise that question. Ex parte Siebold, 100 U. S. 371, 25 L. Ed. 717; Ex parte Clarke, 100 U. S. 399, 25 L. Ed. 715; Ex parte Yarbrough, 110 U. S. 651, 4 Sup. Ct. 152, 28 L. Ed. 274; Ex parte Royall, 117 U. S. 241, 6 Sup. Ct. 734, 29 L. Ed. 868; In re Coy, 127 U. S. 731, 8 Sup. Ct. 1263, 32 L. Ed. 274. In Ex parte Royall, supra, the matter was squarely put as one of discretion. Recently the cases have declined to consider the unconstitutionality of the statute in this way, probably because of the increasing business of the Supreme Court. In Re

Lincoln, 202 U. S. 178, 26 Sup. Ct. 602, 50 L. Ed. 984; Ex parte Spencer, 228 U. S. 652, 33 Sup. Ct. 709, 57 L. Ed. 1010; Henry v. Henkel, 235 U. S. 219, 35 Sup. Ct. 54, 59 L. Ed. 203; Glasgow v. Moyer, 225 U. S. 420, 32 Sup. Ct. 753, 56 L. Ed. 1147. The last cases in which the merits were in any respect considered were Matter of Heff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848, and Matter of Gregory, 219 U. S. 210, 31 Sup. Ct. 143, 55 L. Ed. 184.

Again, it is settled that, when a state tries unlawfully to interfere by criminal prosecution with the activities of the United States, a federal court may intervene in its discretion by habeas corpus. Prosecutions in state courts for perjury in federal proceedings are within this rule. Ex parte Bridges, 2 Woods, 428, Fed. Cas. No. 1,862; In re Loney, 134 U. S. 372, 10 Sup. Ct. 384, 33 L. Ed. 949. In the same class are In re Neagle, 135 U. S. 1, 10 Sup. Ct. 658, 34 L. Ed. 55, and Boske v. Cummingore, 177 U. S. 466, 20 Sup. Ct. 701, 44 L. Ed. 846. These are frankly cases where the conviction was for a crime over which the court below had jurisdiction in the usual sense, just as much as in the case of an unconstitutional statute.

There seems to be no fixed rule to tell what errors of the court below will be treated as jurisdictional; e. g., Ex parte Lange, 18 Wall. 163, 21 L. Ed. 872. An extreme case is Hans Nielson, Petitioner, 131 U. S. 176, 9 Sup. Ct. 672, 33 L. Ed. 118, a case of very doubtful authority, in view of Ex parte Bigelow, 113 U. S. 328, 5 Sup. Ct. 542, 28 L. Ed. 1005, and In re Belt, 159 U. S. 95, 15 Sup. Ct. 987, 40 L. Ed. 88, unless it be confined to cases arising in territorial courts, which hardly seems a valid distinction. In Ex parte Bain, 121 U. S. 1, 7 Sup. Ct. 781, 30 L. Ed. 849, the error of amending an indictment was treated as jurisdictional. Obviously the distinction between the formal jurisdiction of a court and the regularity of its procedure is not rigid.

The upshot of it seems to me to be that, while in general the writ will not be used as a substitute for a demurrer (Ex parte Watkins, supra; Ex parte Parks, supra; In re Coy, supra; Hyde v. Shine, 199 U. S. 62, 82, 25 Sup. Ct. 760, 50 L. Ed. 90), or for a demurrer to the evidence (Harlan v. McGourin, 218 U. S. 442, 31 Sup. Ct. 44, 54 L. Ed. 1101, 21 Ann. Cas. 849), yet, when large public interests demand immediate action, it may. Even then it is clear that the review is limited to whether there was any basis on the facts as found for the action reviewed. Ex parte Terry, 128 U. S. 289, 305, 306, 9 Sup. Ct. 77, 32 L. Ed. 405; In re Debs, 158 U. S. 564, 600, 15 Sup. Ct. 900, 39 L. Ed. 1092. The appellant's attempt rigidly to classify these exceptions appears to me more definite than the books warrant. A safer rule is to say somewhat vaguely that they must be occasions of pressing necessity.

The law seems to be decidedly more liberal in contempt cases, no doubt because of their summary character and liability to abuse. With the exception of Ex parte Kearney, supra, I have found no case in the Supreme Court which refused to consider the merits, at least, to determine whether the offense was in fact within the statute of contempts. Section 268 of the Judicial Code. That case turned on the privilege of a witness against self-incrimination, and if the privilege

in fact existed the court was in error for committing the witness. It was possible to say that the privilege destroyed jurisdiction, just as the appellee here argues of Craig's supposed privilege; indeed, that would have been no stronger than Hans Neilson, Petitioner, supra. But very few cases have gone as far as that. Certainly it can be said that the decision is not an authority against the appellee here in so far as concerns an examination of the existence of those facts on which the court's power was defined, because in Ex parte Kearney, supra, no one questioned that the witness had refused to answer. Moreover, the case was decided before 1831, when the common-law powers of the court were first limited by the proviso of section 268.

In Savin, Petitioner, 131 U. S. 267, 9 Sup. Ct. 699, 33 L. Ed. 150, and Cuddy, Petitioner, 131 U. S. 280, 9 Sup. Ct. 703, 33 L. Ed. 154, both decided at the same time, the question was considered whether the misconduct in fact obstructed justice, although the relator was unsuccessful in each case. In Cuddy's Case it was expressly said (131 U. S. 286, 9 Sup. Ct. 703, 33 L. Ed. 154) that, had the facts shown that he was not guilty, he would have been discharged. There appear to have been no exceptional circumstances to justify a recourse to habeas corpus as against the more usual methods.

In re Watts & Sachs, 190 U. S. 1, 23 Sup. Ct. 718, 47 L. Ed. 933, turned on whether the relators had in fact violated the order of the bankruptcy court. This point was examined and the relators released. It is true that there was a conflict between state and federal authority; but there was no occasion to vindicate the federal authority, since the District Court had already done so, and, indeed, if I may use the phrase, overdone so.

In general, it is well settled that the writ will lie when the conviction is for violation of an order which the court had no power to make. Ex parte Rowland, 104 U. S. 604, 26 L. Ed. 861; Ex parte Fisk, 113 U. S. 713, 5 Sup. Ct. 724, 28 L. Ed. 1117; In re Ayers, 123 U. S. 443, 8 Sup. Ct. 164, 31 L. Ed. 216; In re Reese (C. C.) 98 Fed. 984; Ex parte Robinson, 144 Fed. 835, 75 C. C. A. 663. The appellant answers these by saying that a void order cannot be the basis of any action, but that begs the question. That precise argument applies equally to unconstitutional statutes, yet it is now settled, as I have said, that generally it is not enough that the statute under which the court acts is unconstitutional; that point must ordinarily be raised by writ of error. Though the order be void whose violation is punished, it would have been as easy to say, as in Re Lincoln, supra, for example, that the court was engaged in punishing an offense over which it concededly had jurisdiction in the stricter sense, and that therefore the review must be by writ of error. The cases are clear authority for the proposition that habeas corpus will, at times anyway, examine whether the underlying facts necessary to the commitment exist.

Cuyler v. Atlantic, etc., Co. (In re Daniels) 131 Fed. 95, though only a decision of a Circuit Judge, is squarely in point, and the ruling in this respect is not affected by the fact that on the merits it conflicts with Toledo Newspaper Co. v. U. S., 247 U. S. 402, 38 Sup. Ct. 560, 62 L. Ed. 1186.

In Ex parte Buskirk, 72 Fed. 14, 18 C. C. A. 410 (C. C. A. 4th), the contempt punished had been for violation of a stipulation, and the relator was discharged on habeas corpus. The case is analogous to Ex parte Rowland, supra, and its fellows just above cited.

But the most recent, and I think an entirely apposite, case is Ex parte Hudgings, 249 U. S. 378, 39 Sup. Ct. 337, 63 L. Ed. 656, 11 A. L. R. 333. There the question was the same as here and in Savin, Petitioner, supra; i. e., whether there had been misbehavior obstructing the administration of justice, and the Supreme Court examined the question on the facts to ascertain whether the cause was within the court's jurisdiction. It recognized that the usual course was by writ of error, but thought that the circumstances justified an exception in that case. Its reasons for so thinking are to be found in 249 U. S. on page 384, 39 Sup. Ct. 340 (63 L. Ed. 656, 11 A. L. R. 333) as follows:

"In view of the nature of the case, of the relation which the question which it involves bears generally to the power and duty of courts in the performance of their functions, of the dangerous effect on the liberty of the citizen when called upon as a witness in a court which might result if the erroneous doctrine upon which the order under review was based were not promptly corrected, we are of opinion that the case is an exception."

This case, therefore, very clearly turned on a question of discretion, and that a question of no greater public importance than here. Not only does the case at bar arise from a controversy between a municipality and the District Court, but the result of the court's order was to imprison Craig for 60 days. He is the chief financial officer of a city of 6,000,000 inhabitants and his enforced absence from his duties was presumptively a matter of public concern, quite independent of any interests of his own. Its enforcement would in the nature of things be likely to arouse public feeling and to have an importance altogether greater than that of a private person. If the freedom of witnesses called to court justified an exception, it seems to me that the case at bar must do so.

Finally, it should be remembered that before Toledo Newspaper Co. v. U. S., supra, the law had been much misunderstood, and, if that case was rightly interpreted in the District Court, the powers of a judge in contempt have a scope which, so far as I can see, is scarcely distinguishable in final results from contempt at common law. If so, it is of added importance that this should be understood with as little delay as possible, because nothing can more nearly touch the liberty of the citizen. Prosecution for contempt may be and generally is summary beyond any other; the fact that it was not summary in the case at bar is immaterial. If the citizen is liable to its impact, whenever he animadverts upon a judge before whom no decision is presently pending which his language can affect, no one can deny that the question is of high moment. I cannot, therefore, doubt that the Circuit Judge had the power in his discretion to issue the writ and to determine whether there was any basis in fact for the commitment.

It is quite true that recourse to so exceptional a remedy ought to be rare, when the judge issuing the writ is of co-ordinate jurisdiction with the committing court, especially here, since Craig had not

been denied his release pending writ of error. What may be urgency enough for the Supreme Court is not necessarily the same for one District Judge in reviewing another. Indeed, if the time had not long since expired within which a writ of error could be filed, I should be disposed to reverse the order on the ground that, though permissible, the writ was not necessary to accomplish justice, and should not have been granted. Nevertheless, this consideration does not go to the power to issue it, nor generally to the considerations which make the case an exception, but rather to the propriety of its issuance by a single judge. It seems to me an answer that, if the writ now fails, the relator will lose, by a mistake in his remedy, any opportunity to review the case in any court. In view of this supervening situation, I think we should ignore the objection, and treat the case as though the application had been originally made to an appellate court.

The question upon the merits is whether the letter obstructed the administration of justice. The information alleged that it tended and was intended to influence the court in the consideration of the receivership proceedings, to intimidate the court, and to compel it to decide future questions as the relator wished, and to obstruct the court's orders in such suits. As the case comes up after conviction, I think that the relator's intent must be taken as proved; but nowhere in the information or the evidence does it appear what future decisions the letter would in fact have influenced. Apparently there was nothing pending at the time, and so far as appeared nothing imminent on which the court was to act.

It is true, we can see from the record that there were certain matters which might, and probably would, come before the court, arising between the city and the railways. The city was a large investor and had very large claims against the roads. It was at least possible that disputes might arise as to their allowance when the property was disposed of. It was also possible that, under the leave reserved, the city might again apply for a coreceiver, although nearly nine months had passed and two other receiverships had been granted, without any such renewal. Although it does not appear in the record, perhaps I should also assume that there would be other matters arising in the receivership, all of which must come before the same judge and which would involve the city's interests.

Therefore the case presents the question whether the possibility, and, if one likes, the probability, that such questions would come up, coupled with the intention to influence the court, if they did, was enough to bring the letter within section 268. I agree with the suggestion of Judge Denison in Toledo Newspaper Co. v. U. S., 237 Fed. 986, 990, 150 C. C. A. 636, that there may be no absolute necessity that the utterance should affect a case actually pending. Thus, if one should threaten a judge with personal injury, if he did not decide a case in a given way, it would be a contempt though the complaint was not yet filed. The rule does not depend upon formalities. Conversely, I think it makes no difference here that the possible proceedings which might be affected would arise procedurally in the same suit. They would be as little and as much influenced as though they came up by

independent proceedings. The point, as I view it, is the proximity of the result to the misbehavior.

In the somewhat analogous case of obstructing the draft, the Supreme Court laid down the rule that the words must constitute "clear and present danger" that the evil will result. Schenck v. U. S., 249 U. S. 47, 52, 39 Sup. Ct. 247, 63 L. Ed. 470. In Frohwerk v. U. S., 249 U. S. 204, 39 Sup. Ct. 249, 63 L. Ed. 561, and Abrams v. U. S., 250 U. S. 616, 40 Sup. Ct. 17, 63 L. Ed. 1173, the rule was not repeated, and the element of intent was emphasized; but the effect of the words was none the less immediate, and I do not understand that the earlier test was repudiated. I cannot suppose, for example, that it would make the abuse of a judge for a past decision a contempt to show that the utterer intended generally to intimidate the judge, should a similar case arise in the future, if it was uncertain whether it would in fact arise or when. If the words do not themselves refer to the future, the circumstances surrounding their utterance must be such as immediately to cause the evil which the statute seeks to suppress. A merely possible result, though intended, does not seem to me enough. As was said in Schenck v. U. S., supra, "it is a question of proximity and degree."

For instance, it is common enough for newspapers to criticize very severely even the decisions of the Supreme Court, and every one agrees that this is not unlawful. Suppose it be shown that it is the purpose of the editors to influence the court in future cases of that general character, by showing that the decision meets with popular disapproval. Probably that is often the intent. I cannot suppose that immunity depends upon the absence of any such purpose. If so, the editors stand in more peril than I believe they suppose. Rather, as it seems to me, it must be shown either that the words refer to future decisions, and constitute in substance a threat, or that owing to the immediacy of some case, they in fact constitute an immediate intimidation. Usually I believe the decision to be affected must be one which is already sub judice; but, if not, it must be one to whose unbiased determination the utterance is a "clear and present danger."

Nor does the distinction seem to me without a sound basis in policy. It is in small encroachments upon the right of free criticism of all the acts of public officials that the real danger lies. If a judge may punish those who indirectly interfere with possible decisions, remote in time (when the force of the present obloquy has been spent), the line between that and punishment for unseemly or false comment upon past decisions becomes so shadowy as in application to disappear. It will, in effect, be practically impossible to show that the utterer did not have in mind the future effect of his words upon similar cases in the future. Especially is this the case if there be added the doctrine that all men are charged with those results of their conduct which are to be reasonably apprehended.

Hence I cannot agree that the intent which I must accept as proved in the case at bar takes the letter out of the class of comment, which, whether or not defensible morally, is immune from summary punishment by contempt. It seems to me beyond such prosecution in the in-

terest of free discussion, regardless either of its temper or even of its truth. As to such injuries a judge, in company with all other public officials, has no higher protection than a private person. Indeed, the letter strikes me as indistinguishable from the common instance of a disappointed suitor who vents his spleen upon the judge, with a disregard of truth. I assume that generally such a one has it in his mind to teach the judge a lesson, which he expects that his interest, if not his conscience, may be able to understand. Nor does the fact that the letter was false, while it greatly affects the moral quality of the act, determine its criminality. It is punishable only if it interferes with justice, and in that respect truth is harder to meet than falsehood.

The case of Toledo Newspaper Co. v. U. S., supra, does not touch the point at all. It finally determines that the test of the proximity (nearness) of the misbehavior is causal, not spatial, but that is all. The utterances there were by their terms directed towards a matter actually sub judice, and the danger was "clear and present," if any danger could be. There was no intimation that any statements could be contumacious which referred to decisions not only not then pending, but, if and when they arose, remote in time.

The writ was not sealed, and was irregularly tested, but those are procedural irregularities only. After return regularly made, it is too late to raise them now. They were curable at any stage.

I think that the relator was properly discharged, and that the order should be affirmed.